[No. S111029. Jan. 24, 2005.]

In re JOHN E. DANNENBERG on Habeas Corpus.

## Counsel

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Allen R. Crown, Acting Assistant Attorney General, Susan Duncan Lee and Matthew D. Mandelbaum, Deputy Attorneys General, for Appellant the People.

Bonnie M. Dumanis, District Attorney (San Diego), George M. Palmer, Head Deputy District Attorney, Richard J. Sachs, Deputy District Attorney; and David R. LaBahn for California District Attorneys Association as Amicus Curiae on behalf of Appellant the People.

Kathleen Kahn, under appointment by the Supreme Court, for Respondent John E. Dannenberg.

## Opinion

**BAXTER, J.**—In this case involving a second degree murderer, we consider how the Board of Prison Terms (Board or BPT) may determine that a prisoner with an "indeterminate" life sentence, having served the minimum period of confinement required by statute, is nonetheless presently unsuitable for the setting of a fixed parole release date because the gravity of the inmate's offense indicates a continuing danger to public safety. The issue is whether the Board may refuse a parole date on this ground only after evaluating the offender's crime against others of similar gravity and against its own uniform-term "matrices," and concluding that the offense is particularly egregious by those comparative standards, or whether it need conduct such a comparative analysis only after it determines that the inmate is suitable for parole.

John E. Dannenberg is serving a sentence of 15 years to life for the second degree murder of his wife, committed in 1985. He beat her with a pipe wrench during a domestic argument. Thereafter, she drowned in the bathtub. Exactly how this happened is unclear. However, despite Dannenberg's insistent denials, the circumstances permit an inference that, while she was helpless from the beating, Dannenberg placed or forced her head underwater, or at least allowed it to remain there, until she died.

In 1999, as on several prior occasions, the Board declined to grant Dannenberg a parole release date. The Board concluded that Dannenberg's crime indicated a continuing public danger, thus making him presently unsuitable for parole, because the murder was "especially callous and cruel" and was committed for a trivial reason. Following its long-standing formal policy, the Board made its unsuitability determination by confining its examination to the particular circumstances of Dannenberg's crime, without measuring his offense against other homicides, or against the Board's own uniform-term norms for second degree murderers.

The Court of Appeal held that the Board proceeded incorrectly. Construing the pertinent statute, Penal Code section 3041,[1] the court ruled that once an indeterminate life prisoner reaches minimum parole eligibility, the Board *must* set a fixed date for parole release, pursuant to the principle of "uniform terms" for crimes of similar gravity, and with due regard for the statutory *minimum* term for the inmate's offense, unless it finds the prisoner's crime "particularly egregious" *in comparison to other offenses of the same class.* Accordingly, the court remanded the case for a new parole hearing under proper standards.

█ We conclude that the Court of Appeal erred. While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentencees should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on grounds the particular offender's criminality presents a *continuing public danger.*

Indeed, under other provisions of law, the Board *cannot grant* a parole date to a life-maximum prisoner without considering the concerns expressed by interested persons, including victims, their families, and law enforcement officials involved in the case, that *this particular offender* is still too dangerous, by virtue of the crimes he or she has committed, to be scheduled for release. If a Board panel does set a parole date, the Governor may request review by the full Board on grounds that the panel did not fully consider the crime's gravity, or public safety, in which case a majority of the full Board must vote to uphold the panel's decision. In the case of a murderer, the Governor may overturn a grant of parole on any basis the Board could have used to deny it. The statutory scheme, viewed as a whole, thus clearly

---

[1] All subsequent unlabeled statutory references are to the Penal Code.

elevates a life prisoner's individual suitability for parole above the inmate's expectancy in early setting of a fixed and "uniform" parole date.

Moreover, despite recent specific attention to section 3041 and the Board's parole procedures, the Legislature has not disturbed the Board's long-standing formal policy that a determination of individual suitability must precede the setting of a "uniform" parole release date. The Legislature therefore appears to have accepted the Board's interpretation of the statute.

■ Accordingly, we conclude that the Board, exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually. While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release. The BPT acts properly in determining unsuitability, and the inmate receives all constitutional process due, if the Board provides the requisite procedural rights, applies relevant standards, and renders a decision supported by "some evidence."

■ Of course, no inmate may be imprisoned beyond a period that is *constitutionally proportionate* to the commitment offense or offenses. But that limitation will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment. Its potential application in occasional individual cases does not require the BPT, under the current statutory scheme, to set fixed release dates for all life prisoners except those whose crimes are most "egregious" compared to others of the same class. Instead, the Board may decline to do so in an individual case if it concludes, on relevant grounds with support in the evidence, that the grant of a parole date is premature for reasons of public safety. Life inmates who believe that such Board decisions have kept them confined beyond the time the Constitution allows for their particular criminal conduct may take their claims to court.

Here the Board's conclusion that Dannenberg remains too dangerous for parole because his offense was especially callous and cruel, and was committed for a trivial reason, relied upon facts beyond the minimum elements of second degree murder, and was supported by some evidence. The Board's decision to deny parole thus comports with the law.

We will therefore reverse the judgment of the Court of Appeal.

## FACTS AND PROCEDURAL BACKGROUND

In 1986, Dannenberg was convicted by a jury of second degree murder and was sentenced to the prescribed term of 15 years to life (§ 190, subd. (a)). With allowance for applicable pretrial and prison conduct credits, his minimum eligible parole release date was June 25, 1996. In parole hearings conducted in 1994, 1997, and 1999, the Board declined to set an actual parole release date for Dannenberg, each time relying primarily on the nature of the murder itself to find him presently unsuitable.

In the 1999 proceeding, at issue here, the Board considered the following circumstances of the commitment offense, drawn from a staff report prepared in 1994 for Dannenberg's initial parole hearing:[2]

Dannenberg and his wife experienced severe domestic difficulties for a number of years. They had sought marriage counseling, and the victim had been seen by psychiatric personnel for complaints including violence to her and her children.

On May 15, 1985, around 9:00 a.m., law enforcement authorities were summoned to the couple's home in Los Altos Hills. In a bathroom, they found the victim's body, draped over the side of the bathtub with her head underwater in the tub. Dannenberg had several scratches on his body, a deep bite mark on his left middle finger, and cuts on his neck, eyelid, and face. An autopsy disclosed that the victim's body had various cuts, abrasions, and puncture wounds, consistent with being hit on numerous occasions. One of the wounds matched the markings of a half-pound pipe wrench. The autopsy report concluded that although the victim had been hit many times on the head, the cause of death was drowning.

Dannenberg gave investigating officers the following account: Around 7:00 a.m., he was drawing a bath for his son when he noticed debris in the drain that could cause a clog. He procured a pipe wrench and a screwdriver to fix a leaky toilet valve. "During this time[,] he evidently said something to his wife" about the drain. She came into the bathroom and picked up the screwdriver. A heated argument ensued. Screaming that she "wanted him dead," the victim jabbed the screwdriver at Dannenberg, cutting his arm, and clawed and scratched his forearm with her fingernails. Dannenberg first tried

---

[2] The report in question is entitled Life Prisoner Evaluation-Initial Parole Consideration Hearing. The chairman of Dannenberg's 1999 parole panel stated that this was the source of the facts relied upon by the panel in rendering its decision. As indicated in the text, the panel also heard testimony from Dannenberg himself about the events leading to his wife's death.

to defend himself with his bare hands. Then he picked up the pipe wrench and hit the victim once on the side of the head. When she continued to advance on him, he "hit her a couple more times on the head," and she fell to the floor. Dannenberg himself collapsed "and may have passed out." When he awoke, he checked the victim's pulse, but could not find one. He then called 911.

The 1999 parole panel also heard extensive live testimony from Dannenberg. He testified to the following additional details: As both he and the victim collapsed on the floor, the victim was lying on her back, still holding the screwdriver, and Dannenberg was kneeling over her, pinning her arms. She seemed to relax, but then suddenly placed her feet against his shoulders and pushed. He was knocked back against the bathroom door and fell to the floor. After that, he remembered nothing until he saw the victim lying on the edge of the tub. A pool of blood covered the floor where she had previously lain. There was also considerable blood on her head and smeared on the wall. Dannenberg could not move at first, because his legs, curled underneath him, were asleep. From his low position, and in a dazed condition, he did not notice the victim's head was in the water. Eventually he reached over and tried to take her pulse, but could not feel anything. He then struggled to his feet, went to his bedroom, and called 911. The fire department responded within a few minutes but determined that the victim was dead and did not try to resuscitate her.

A panel member noted that the victim must have lain on the floor quite a while for such a pool of blood to accumulate, "so we're going to have a hard time believing that she [lay] there and then got up and crawled into the bathtub after she bled out all over the floor. Do you see how that doesn't make a lot of sense?"

In response, Dannenberg denied placing his wife in the tub. Citing evidence of blood on the underside of the bathtub spout, Dannenberg reiterated his trial theory that the victim must have tried to rise on her own, climbed over the edge of the tub, "and either tried to wash herself or had attempted to get up and slipped and got her face in the water and jerked her head up and hit her head on the spout and then went down again and drowned." Dannenberg insisted the evidence he presented at trial demonstrated that he could not have moved her into the tub without walking in the blood on the bathroom floor, thus "making a mess" of the murder scene.

Citing Dannenberg's estimate that he was only unconscious for "a minute or so" before seeing the victim draped over the tub, one panel member questioned how she could drown that quickly. Dannenberg noted the coroner's trial testimony "that death by drowning can be instantaneous through

something called a laryngospasm where you apparently try . . . to inhale and get water and you go out immediately."

In his argument to the panel, Dannenberg expressed remorse for causing his wife's death, but he denied he intended to kill her, either by beating or by drowning. He stressed he had been prosecuted on a theory of first degree premeditated murder, but was convicted only of second degree murder, which might involve only implied malice. According to Dannenberg, the prosecutor told the jury that the circumstances of the victim's death could never be known for certain, and the Attorney General conceded on appeal that the death by drowning was unexpected. This permanent uncertainty, he urged, was not a basis for denial of parole.

Dannenberg noted that, except for the commitment offense, he had no criminal or drug history. He urged that he had accepted responsibility of his actions, stating that his wife "would in all likelihood not have died if I had not hit her that morning." He pointed out that, while in prison, he had remained discipline free, and had pursued all recommended therapy, vocational training, and self-help programs. He cited his college degrees in mathematics and engineering, and his decades of expertise in electronics. He indicated he had several offers of housing, sufficient liquid assets to support himself, an offer of employment, and plans to start a water conservation business.

Dannenberg's May 1999 psychological evaluation also described him as a model prisoner. Accepting Dannenberg's version of the facts, the evaluation surmised that the murder was a one-time response to Dannenberg's extreme stress and fear of his wife's rage while she was armed with the screwdriver. In line with previous assessments, the evaluation diagnosed Dannenberg as showing no signs of mental or emotional disorder and concluded he presented a low risk of further violence.

In its oral ruling that Dannenberg was presently unsuitable for parole, the panel stated that "the primary reason is the commitment offense itself." The panel found that the murder was committed "in an especially cruel or callous manner," and was carried out in a way that "demonstrates an exceptionally callous disregard for human suffering." For support, the panel "rel[ied] partially on the autopsy report[,] which indicated that the victim was repeatedly struck in the head, and at some point the victim . . . was pushed or fell into the bathtub full of water and the eventual cause of death was drowning. . . ." Moreover, the panel found, the motive for the crime "was inexplicable or very trivial in relation to the offense." While concluding that "there [were] no psychiatric factors to consider," the panel asserted that

"the prisoner needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others."

Separately ruling that the next parole hearing would be postponed for two years, the panel cited similar considerations. Additionally, the panel opined, Dannenberg "needs to accept full responsibility for the crime . . . and discontinue his attempts to minimize his responsibility for that."

After exhausting his administrative remedies, Dannenberg filed a petition for habeas corpus in the Marin County Superior Court.[3] The petition asserted that, (1) having been convicted only of implied-malice second degree murder, he was wrongly denied parole for refusing to admit express-malice first degree murder (see § 5011, subd. (b) (section 5011(b)) [in setting parole date, BPT may not require admission of guilt to any crime]), and (2) there was no reliable, affirmative evidence of his current dangerousness, so as to overcome the Board's presumptive duty, under subdivision (a) of section 3041, to set a date for release on parole.

The superior court issued an order to show cause. On May 8, 2001, after an evidentiary hearing, the court granted relief. It found no basis for the Board's determination that Dannenberg was unsuitable, on grounds of public safety, for an otherwise mandatory parole date.

The court reasoned as follows: Dannenberg had no criminal history and had shown remorse for his wife's death. His prison record and postrelease plans were exemplary. Prison psychologists found no mental or emotional disorder, and there was no evidence he needed therapy. Nor could unsuitability be based on the nature of the commitment offense itself, because there

---

[3] The petition named Dave Hepburn, Chair of the BPT, and J. S. Woodford, Warden of San Quentin Prison, as "respondents." With legal representation by the California Attorney General, the case was litigated in the names of Hepburn and Woodford in the superior court. However, the superior court's ultimate order, granting a new parole hearing under specified standards, was directed to the Board itself. On appeal from this order (see discussion, *post*), the Attorney General observed to the Court of Appeal that while Woodford, as Dannenberg's custodian, was technically the proper "respondent" in the habeas corpus proceeding, the Board itself was the party directly affected. Accordingly, the Attorney General noted, "for the sake of convenience and clarity, we address this appeal solely from the Board's perspective." The Court of Appeal accepted this characterization of the case, and its judgment, affirming the need for a new parole hearing, was also directed to the Board alone. The problem of proper party identification is further complicated by the fact that while Dannenberg is the "petitioner," and the parties represented by the Attorney General are the "respondents," in the original habeas corpus proceeding, the Attorney General's clients were the "appellants" in the Court of Appeal and the "petitioner" in this court, while Dannenberg is the "respondent" in both appellate courts. Accordingly, for convenience hereafter, we refer to the opposing parties simply as Dannenberg and the Board or the BPT.

was no evidence that Dannenberg's crime was callous and cruel, or indifferent to human suffering, beyond any and all second degree murders. Finally, the Board's reliance on Dannenberg's failure to accept full responsibility for his crime violated section 5011(b).

The court ordered the Board to conduct a new parole hearing no later than August 17, 2000. The court "anticipated" that, at this hearing, the Board would set a parole date absent changed circumstances or evidence not previously presented. Referring to the Board's "matrices" of "base terms" for second degree murderers, the court concluded that the circumstances of Dannenberg's crime indicated a parole date of 17, 18, or 19 years after the date of the commitment offense (May 15, 1985).[4] With allowance for applicable conduct credits, the court calculated this date as February 15, 1998.

The Court of Appeal for the First Appellate District, Division Three, affirmed in part and reversed in part. Applying its own intervening decision in *In re Ramirez* (2001) 94 Cal.App.4th 549 [114 Cal.Rptr.2d 381] (*Ramirez*), the Court of Appeal reasoned as follows: The principle of the determinate sentencing law (DSL) that similar crimes should receive similar terms, followed by a period of parole, applies to indeterminate life prisoners, including murderers, by virtue of section 3041, subdivision (a). This statute commands that life prisoners "shall normally" receive parole release dates, calculated to provide sentence uniformity for offenses of similar gravity and magnitude. Hence, when determining a life prisoner's parole suitability, the Board must first compare his or her crime against other similar offenses of the same class, taking into account the minimum term to which the inmate was sentenced. The Board may not continue to find an inmate unsuitable under section 3041, subdivision (b), without considering whether the term he or she is serving is disproportionate to the seriousness of the commitment offense, and to the terms served for other similar crimes. The commitment offense will justify a finding of unsuitability only if it is particularly egregious by these standards. The Board erred by failing to conduct such a comparative analysis before finding Dannenberg unsuitable.

Like the superior court, the Court of Appeal concluded that there was no evidence for the Board's finding that Dannenberg needed therapy. The Court of Appeal also agreed the Board could not penalize Dannenberg for insisting he did not drown his wife. In two respects, however, the Court of Appeal

---

[4] It is not clear why the superior court concluded that the parole release date must be calculated from the date of the crime. This would make sense only if Dannenberg was jailed that same day, and was held without bail, or failed to make bail, pending his trial, conviction, and sentencing.

ruled that the superior court had improperly analyzed the Board's "primary reason" for denying parole, the gravity of the commitment offense: First, the lower court wrongly concluded that, because all murders are committed with malice, a second degree murderer cannot be denied parole on grounds his or her crime was exceptionally callous and cruel. Second, the court below improperly reweighed the evidence to direct the Board to reach a particular result on remand. On the contrary, the Court of Appeal held, the Board must be allowed to reconsider Dannenberg's suitability for parole under proper standards.

The Board sought review, urging that under section 3041, it may defer any consideration of term proportionality or uniformity until after it determines that a life inmate is suitable for parole. We granted review, limited to the following question: "At a parole suitability hearing . . . pursuant to . . . section 3041, must the Board . . . generally engage in a comparative proportionality analysis with respect to offenses of similar gravity and magnitude and consider base term matrices used by the Board in setting release dates[,] and deny a parole date solely on the basis of the circumstances of the offense only when the offense is particularly egregious, or may the Board first determine whether the inmate is suitable for parole because he or she is no longer a threat to public safety and engage in a proportionality analysis only if it finds the inmate suitable for parole?" We turn to that question.[5]

## DISCUSSION

For decades before 1977, California employed an "indeterminate" sentencing system for felonies. The court imposed a statutory sentence expressed as a range between a minimum and maximum period of confinement—often life imprisonment—the offender must serve. An inmate's actual period of incarceration within this range was under the exclusive control of the parole authority, which focused, primarily, not on the appropriate punishment for the original offense, but on the offender's progress toward rehabilitation. During most of this period, parole dates were not set, and prisoners had no idea when their confinement would end, until the moment the parole authority decided they were ready for release. (See *People v. Jefferson* (1999) 21 Cal.4th 86, 94–95 [86 Cal.Rptr.2d 893, 980 P.2d 441] (*Jefferson*); Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 6–16 (Cassou & Taugher).)

---

[5] We acknowledge the assistance provided in this regard by amicus curiae briefs of the California District Attorneys Association, in support of the People, and inmates Neil Darrow and Nathan J. Ellis, in support of Dannenberg.

The DSL, adopted in 1976, largely abandoned this system. The DSL implemented the Legislature's finding that "the purpose of imprisonment for crime is punishment," a goal "best served by terms proportionate to the seriousness of the offense," with provision for sentence "uniform[ity]" for similar offenses. (§ 1170, subd. (a)(1).)

■ Under the DSL, most felonies are now subject, in the alternative, to three precise terms of years (for example, two, three, or four years, or three, five, or seven years). The court selects one of these alternatives (the lower, middle, or upper term) when imposing the sentence. (§ 1170, subds. (a)(3), (b); see *Jefferson, supra,* 21 Cal.4th 86, 95.) The offender must serve this entire term, less applicable sentence credits, within prison walls, but then must be released for a further period of supervised parole. (§ 3000, subd. (b); see Cassou & Taugher, *supra,* 9 Pacific L.J. 5, 26.)

■ However, certain serious offenders, including "noncapital" murderers (i.e., those murderers not punishable by death or life without parole), remain subject to indeterminate sentences. These indeterminate sentencees may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement. (See *Jefferson, supra,* 21 Cal.4th 86, 92–93.) As under prior law, life inmates' actual confinement periods within the statutory range are decided by an executive parole agency. This agency, an arm of the Department of Corrections, is now known as the BPT. (See § 3040.)

■ Section 3041 addresses how the Board is to make parole decisions for indeterminate life inmates. Subdivision (a) provides that, one year before the prisoner's minimum eligible parole date, a Board panel shall meet with the inmate, "shall normally set a parole release date," and shall do so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." The release date also must "comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." The Board must "establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime . . . and other factors in mitigation or aggravation of the crime."

■ In response to these requirements, the Board has adopted regulations covering the various categories of indeterminate life inmates. One set of these regulations applies specifically to noncapital murderers who committed their crimes on or after November 8, 1978. (Cal. Code Regs., tit. 15, § 2400

et seq.)[6] If such a murderer is found suitable to have a parole release date set under section 3041, subdivision (a), the regulations specify that the inmate's release date is to be set by calculating a "base term." (Cal. Code Regs., tit. 15, § 2403, subd. (a).) The first step in the calculation is to determine where the particular murder fits, in terms of its relative seriousness, on a biaxial "matrix" of factual variables. (*Ibid.*) The matrix specifies lower, middle, and upper "base terms" for each matrix category. For second degree murderers serving statutory sentences of 15 years to life, these "base terms" range from 15, 16, or 17 years for the least serious matrix category to 19, 20, or 21 years for the most serious. (*Id.,* § 2403, subd. (c).)

■ Once the proper matrix category is selected, the Board must impose the middle term unless it finds aggravating or mitigating circumstances not accounted for in the matrix. (Cal. Code Regs., tit. 15, § 2403, subd. (a).) If the Board finds mitigating circumstances, it "shall impose the lower base term or another term shorter than the middle base term" (*id.,* § 2405, subd. (a)); if it finds aggravating circumstances, it "may impose the upper base term or another term longer than the middle base term" (*id.,* § 2404, subd. (a)).[7]

■ However, subdivision (b) of section 3041 specifies the circumstances under which a date for an indeterminate life inmate's release on parole need *not* be fixed. Subdivision (b) provides that a parole release date shall be set "*unless* [the Board] determines" that the inmate is presently *unsuitable* for the fixing of a parole date, i.e., that "the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that *consideration of the public safety* requires a *more lengthy period of incarceration* for *this individual,* and that a parole date, therefore, *cannot be fixed* at this meeting." (Italics added.)

■ The regulations governing murderers serving indeterminate life sentences have long provided that determination of an individual inmate's

---

[6] When the DSL was originally enacted, it provided, as had immediately prior law, that the punishment for a first degree murder, other than one punishable by death or life without parole, was a term of "straight life" (seven years minimum); the DSL also newly provided that the punishment for second degree murder, previously five years to life, would be a determinate term of five, six, or seven years. (Former § 190, as amended by Stats. 1976, ch. 1139, § 133, p. 5098; compare Stats. 1976, ch. 1124, § 1, p. 5028, and Stats. 1973, ch. 719, § 1, pp. 1297–1298.) The Legislature later increased the penalty for second degree murder to five, seven, or 11 years. (Former § 190, as amended by Stats. 1978, ch. 579, § 2, p. 1981.) However, under section 2 of Proposition 7, an initiative measure adopted at the General Election of November 7, 1978, the penalty for noncapital first degree murder was increased to 25 years to life, and the penalty for second degree murder was increased to 15 years to life. (See current § 190, subd. (a).) The initiative measure became effective the following day.

[7] Though Dannenberg suggests otherwise, it is not clear that the regulations allow the Board to fix a release date *above* the *upper term* or *below* the *lower term* set forth in the matrix.

*suitability* for parole under section 3041, subdivision (b) must precede any effort to set a parole release date under the uniform-term principles of section 3041, subdivision (a). As currently worded, the regulations specify that "the panel shall *first* determine whether the life prisoner is *suitable* for release on parole. *Regardless of the length of time served*, a life prisoner shall be found unsuitable for and denied parole if in the *judgment of the panel* the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a), italics added.)

Under this policy, if the circumstances of a particular murder persuade the Board that the prisoner who committed it is presently too dangerous to grant a fixed parole release date, the Board may deny parole without deciding when the inmate will be released, and without considering how the prisoner's actual period of confinement may compare with those served by others who committed similar crimes.

The regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Cal. Code Regs., tit. 15, § 2402, subds. (b)–(d).) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (*Id.*, § 2402, subd. (c)(1).) Factors to be considered in this regard include that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" (*id.*, § 2402, subd. (c)(1)(D)) and that "the motive for the crime is inexplicable or very trivial in relation to the offense" (*id.*, § 2402, subd. (c)(1)(E)).

This procedure, in which the suitability determination precedes any effort to calculate a parole release date, has long been noted in the case law. Both we and the Courts of Appeal have consistently described the parole process for indeterminate life prisoners as one in which suitability for parole is within the Board's informed discretion, and must first be found before a parole date is set. (*In re Stanworth* (1982) 33 Cal.3d 176, 183 [187 Cal.Rptr. 783, 654 P.2d 1311] [under both pre-1976 and post-1976 rules, suitability determination precedes setting of parole date]; *In re Duarte* (1983) 143 Cal.App.3d 943, 948 [193 Cal.Rptr. 176] [under section 3041, "the Legislature left a 'consideration of the public safety' as the fundamental criterion in assessing suitability"]; see also *In re Caswell* (2001) 92 Cal.App.4th 1017, 1026 [112 Cal.Rptr.2d 462] [Board has "exclusive authority" to determine suitability; while Board "normally" sets a release date, "parole must be denied . . . if the panel in its discretion determines that the prisoner would pose an unreasonable risk of danger to society if released"]; *In re Seabock* (1983) 140

Cal.App.3d 29, 38 [189 Cal.Rptr. 310] [while Legislature's "primary command" is that Board "shall" set a release date, the exception to that mandate "is one solely within the discretionary power of the Board"].)

Nonetheless, the instant Court of Appeal, adhering to its own recent decision in *Ramirez, supra,* 94 Cal.App.4th 549, concluded that the Board errs by considering term uniformity only after its case-specific review persuades it that the indeterminate life inmate is safe for release on parole. In the Court of Appeal's view, reconciliation of subdivisions (a) and (b) of section 3041 requires that subdivision (a) receive precedence. Thus, the Court of Appeal concluded, when addressing the issue of parole for a murderer serving a life-maximum term, the Board (1) *must first* compare the inmate's actual period of confinement with the minimum statutory confinement for the offense, and with the actual confinements served by others who have committed similar crimes, (2) *must* thereupon set a firm, "uniform" release date unless it finds the public-safety exception applicable, and (3) *may not* deny parole, on grounds the commitment offense reflects a continuing threat to public safety, unless the offense is *particularly egregious* in comparison to others.

Dannenberg, and the dissenting opinion in this court, echo this view. They suggest, in effect, that the Board must schedule an indeterminate life inmate's release on parole, within the parameters of uniform terms for similar offenses, unless it finds the callousness and brutality of a particular inmate's offense, and/or other indicia of his dangerousness, so extreme that the case falls outside the "base term" formulas set forth in the regulations.

The tension between the commands in subdivisions (a) and (b) of section 3041 has been noted since the inception of the DSL. (See Cassou & Taugher, *supra,* 9 Pacific L.J. 5, 86–87.) Nonetheless, we conclude that the Court of Appeal, Dannenberg, and the dissent have misperceived the priorities reflected in section 3041 and other statutes governing parole.

 "In construing a statute, ' "we strive to ascertain and effectuate the Legislature's intent." [Citations.] Because statutory language "generally provide[s] the most reliable indicator" of that intent [citations], we turn to the words themselves, giving them their "usual and ordinary meanings" and construing them in context . . . .' (*People v. Castenada* (2000) 23 Cal.4th 743, 746–747 [97 Cal.Rptr.2d 906, 3 P.3d 278].) 'If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs.' (*People v. Robles* (2000) 23 Cal.4th 1106, 1111 [99 Cal.Rptr.2d 120, 5 P.3d 176].) If, however, the statutory language is susceptible of more than one reasonable construction, we can look to legislative history (*ibid.*) and to rules or maxims of construction

(*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166] [(*Mejia*)]). '. . . The court may [also] consider the impact of an interpretation on public policy, for "where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." ' (*Ibid.*, quoting *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323] [(*Dyna-Med*)].)" (*People v. Smith* (2004) 32 Cal.4th 792, 797–798 [11 Cal.Rptr.3d 290, 86 P.3d 348].)

██ In our effort to divine what the Legislature intended, we may consider not only its internal written expressions of the bill's meaning and purpose, but also " 'the wider historical circumstances of [the bill's] enactment.' " (*Mejia, supra*, 31 Cal.4th 657, 663, quoting *Dyna-Med, supra*, 43 Cal.3d 1379, 1387.) ██ When interpreting parole legislation in particular, we regard the traditional understanding that, once the Board has considered all relevant information and criteria, its authority over parole decisions is extremely broad. Indeed, the " '[Board's] discretion in parole matters has been described as "great" [citation] and "almost unlimited" [citation].' " (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), quoting *In re Powell* (1988) 45 Cal.3d 894, 902 [248 Cal.Rptr. 431, 755 P.2d 881].)

██ Finally, while we take ultimate responsibility for the interpretation of a statute, we accord significant weight and respect to the long-standing construction of a law by the agency charged with its enforcement. (E.g., *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436 [2 Cal.Rptr.3d 699, 73 P.3d 554]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) This is particularly true when the Legislature, presumably aware of the established administrative construction, has implied its acquiescence therein by amending the governing statute in ways that do not disturb the agency's policy. (E.g., *Yamaha Corp. of America v. State Bd. of Equalization* (1999) 73 Cal.App.4th 338, 353 [86 Cal.Rptr.2d 362]; *Thornton v. Carlson* (1992) 4 Cal.App.4th 1249, 1257 [6 Cal.Rptr.2d 375].)

Applying these principles, we first note the obvious. The words of section 3041 strongly suggest that the public-safety provision of subdivision (b) takes precedence over the "uniform terms" principle of subdivision (a). The statute expressly provides that the fixing of a "uniform" parole release date shall occur *unless* the Board finds the indeterminate life inmate unsuitable on grounds of "public safety."

Subdivision (b) of section 3041 states that the determination of suitability shall be based upon "the gravity of the current convicted offense . . . or the

timing and gravity of current or past convicted offense or offenses." But subdivision (b) does not say that, in making this evaluation, the Board must compare the inmate's actual period of confinement with others serving life terms for similar crimes, or that it must consider term uniformity in any respect. Indeed, subdivision (b) indicates otherwise by providing that the suitability determination should focus upon the public safety risk posed by "this individual." (*Ibid.*) The language and structure of section 3041 thus most logically convey that the Board need engage in comparative term analysis *only if* it first determines, applying the pertinent criteria, that the inmate presents no public safety danger, and is thus suitable for parole.

Dannenberg, like the Court of Appeal, stresses that the "uniform terms" language in section 3041, subdivision (a), parallels the fundamental premise of *determinate* sentencing expressed in section 1170, subdivision (a)(1), i.e., that "the purpose of imprisonment for crime is punishment," which purpose is "best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." Thus, it is asserted, the Legislature has imported into the realm of indeterminate life sentences the philosophy of a fixed and uniform period of incarceration, intended simply as punishment proportionate to the commitment offense, and the Board has a presumptive obligation to set life inmates' parole release dates accordingly.

The Legislature clearly intended to apply some determinate sentencing principles to life-maximum inmates. (See generally *Jefferson, supra*, 21 Cal.4th 86, ·95–96.) But the analogy is not complete. For most offenders, the DSL *requires* fixed and uniform terms, set by the court at the time of conviction, and *followed* by mandatory release on parole. The purpose of prison confinement for such offenders is simply proportionate punishment for similar crimes.

But for certain serious criminals, including noncapital murderers, the Legislature has retained sentences of imprisonment *for life*, subject to the possibility of *sooner* release on parole. The decision about when, if ever, each such inmate's prison confinement will actually end, and the period of parole, if any, will actually begin, remains in the hands of the correctional authority, and is deferred until the inmate has already served a minimum required period of prison confinement.

When the time comes to evaluate the individual life inmate's suitability for release on parole, the BPT is authorized—indeed, required—to *eschew* term uniformity, based simply on similar punishment for similar crimes, in the interest of *public safety in the particular case*. Under this "hybrid" sentencing scheme (Cassou & Taugher, *supra*, 9 Pacific L.J. 5, 86),

an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for "this individual" by "consideration of the *public safety.*" (§ 3041, subd. (b), italics added.)

██ So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board (*Rosenkrantz, supra,* 29 Cal.4th 616, 658), the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.

Our conclusion in this regard is confirmed when we read the language of section 3041 in its statutory context. Other provisions governing parole decisions for indeterminate life prisoners—adopted both before and after enactment of section 3041—buttress the notion that the determination of suitability for parole involves a paramount assessment of the public safety risk posed by the particular offender, without regard to a comparative analysis of similar offenses committed by other persons.

Thus, the statutes have long required that notice of a parole hearing be given to local officials connected to the inmate's conviction, including the judge who tried the matter, the prosecuting district attorney, the inmate's trial attorney, and the investigating law enforcement agency. (§ 3042, subd. (a).) The judge may forward to the Board any unprivileged material from the inmate's trial or sentencing proceeding "that is pertinent to the question . . . whether the . . . Board should grant parole." (*Id.,* subd. (f)(2).) The Board must consider the statements and recommendations submitted by these officials, and must "enter on its order granting or denying parole . . . that [such] statements and recommendations have been considered by it." (§ 3046, subd. (c); see also § 3042, subd. (f)(3).)

Under section 3043, adopted by the voters as part of Proposition 8 at the June 8, 1982, Primary Election, victims or their next of kin who have so requested are entitled to be notified of a pending parole hearing, to appear, and "to adequately and reasonably express [their] views concerning the crime and the person responsible." The Board must consider these statements, "and shall include in its report a statement . . . whether the person would pose a threat to public safety if released on parole." (*Ibid.*)

Since enactment of section 3041, the Legislature has also adopted section 3043.5, the Condit-Nolan Public Participation in Parole Act of 1984. Under this statute, "any person interested in the grant or denial of parole to any prisoner . . . shall have the right to submit a statement of views in support of or in opposition to the granting of parole. The Board, in deciding whether to release the person on parole, shall review all information received from the public to insure that the gravity and timing of all current and past convicted offenses have been given adequate consideration and to insure that the safety of the public has been adequately considered. Upon completion of its review, the [B]oard shall include in its report a statement that it has reviewed all information received from the public and its conclusion as to whether the person would pose a threat to the public safety if released on parole." (§ 3043.5, subd. (b); see also § 3042, subd. (f)(3).)

The obvious purpose of these statutes is to guarantee that the Board has fully addressed the public safety implications of releasing *each individual life-maximum inmate* on parole *before it decides to do so*. The statutory requirement that public input on this subject be "considered" necessarily implies that it may be influential, and even decisive in appropriate cases. None of the relevant laws states or implies that the Board must, or may, discount the public safety concerns voiced by interested persons *unless* the inmate's crime is so exceptionally egregious as to fall outside the Board's "uniform terms" formulae. Indeed, the Board cannot perform its "public input" and "public safety" obligations if it *must* start by calculating formulaic "uniform" parole release dates, and is prohibited from denying parole except to inmates whose crimes are demonstrably outside the norm.

Similar considerations apply to another 1984 statute, section 3041.1, which empowers the Governor to request review of any decision by a Board panel to grant or deny parole to a life inmate. "The Governor shall state the reason or reasons for the request, and whether the request is based on a public safety concern, a concern that the gravity of current or past convicted offenses may have been given inadequate consideration, or on other factors." (*Ibid.*) When the Governor makes such a request, the full Board, sitting in bank, must review the decision, and "a vote in favor of parole by a majority of the current Board members shall be required to grant parole." (*Ibid.*)

Under section 3041.1, the Governor's right to request review of a grant of parole is not limited to the most "egregious" cases, and he is not required to allege or show that the commitment offense is "particularly egregious" by comparative standards. Nonetheless, the full Board *must* accede to a gubernatorial request for review in bank, and parole thereafter *cannot be granted* except upon a majority vote of the entire Board.

Nothing in section 3041.1 suggests that the Board's members *must* vote in *favor* of parole *unless* the inmate's offense is substantially more serious than most others of the same class. Indeed, it would seriously undercut the Governor's unconditional statutory right to require a full Board majority decision if, despite a public safety concern that had prompted the Governor to act, the Board was required to rubber-stamp the hearing panel's decision, and to affirm a release date for a potentially dangerous life inmate, unless it found that the commitment offense was "particularly egregious" by comparison to other similar offenses.

Measures adopted since the enactment of section 3041 give the Governor even greater power over parole for murderers such as Dannenberg. At the November 8, 1988, General Election, the voters adopted Proposition 89, which added subdivision (b) to article V, section 8 of the California Constitution. Under this provision, and its implementing legislation (§ 3041.2), the Governor, after examining the record before the Board, and applying the same factors the Board is required to consider, may affirm, modify, or reverse a Board order granting or denying parole on a murder sentence.

All these laws emphasize that the first responsibility of the parole authorities is to evaluate the suitability of an *individual* inmate for *safe* release, and, in making that assessment, to take into account all pertinent information and input *about the particular case* from the inmate's victims, the officials familiar with his or her criminal background, and other members of the public who have an interest in the grant or denial of parole to *this prisoner.* This responsibility is incompatible with the premise that the Board must look primarily to comparative term length, to the Board's own term matrices, or to the minimum statutory term for the inmate's offense, and cannot retain a dangerous life prisoner, as a public safety risk, unless it finds he or she falls outside those rigid parameters.

Dannenberg, the Court of Appeal, and the dissenting members of this court array themselves against our conclusion. They point out that subdivision (a) of section 3041 says the Board "*shall normally*" fix a parole date, pursuant to principles of term uniformity (italics added), and that subdivision (b) confirms the Board "shall" do so "unless" it finds that public safety considerations prevent such action in the particular case. This wording, it is asserted, makes clear that "uniform" parole release, influenced in part by the distinct *minimum* term set by statute for the inmate's offense, is the mandatory "norm[]" (§ 3041, subd. (a)), while the refusal to set a parole release date must be reserved for cases which, in comparative terms, are exceptional.

As *Ramirez, supra,* 94 Cal.App.4th 549 put it, "the Board's authority to make an exception based on the gravity of a life term inmate's current or past

offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by . . . section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. [Citation.]" (*Id.* at p. 570; see also *Rosenkrantz, supra*, 29 Cal.4th 616, 683.) In our view, this interpretation far overstates the meaning of the statute's words.

■ The word "shall" in a statute is generally deemed mandatory (e.g., *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]), but that presumption is not conclusive. (E.g., *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 194 [96 Cal.Rptr.2d 463, 999 P.2d 686].) In section 3041, "shall" is not used in an absolute sense. Instead, the word is *qualified* in subdivision (a) by "normally"—a word not susceptible to precise application[8]—and is further limited in subdivision (b) by "unless," followed by the rule that the Board should *not* set a release date if "consideration of the public safety" requires lengthier incarceration for the particular inmate.

Thus, the statutory language belies the notion of a *mandatory duty* to set a release date for all indeterminate life inmates, or for any particular such prisoner. Indeed, our reading of section 3041 would be the same if the Legislature had *omitted* the qualifying word "normally" from subdivision (a), and had simply provided that the Board "shall" set a "uniform" parole release date "unless," pursuant to subdivision (b), it concludes that a longer period of confinement is warranted for "this individual" by public safety concerns arising from the circumstances of the prisoner's commitment offense or criminal history. The most natural and reasonable way to rproead either version is that subdivision (a) applies only if subdivision (b) does *not* apply, and that the Board, before finding a life-maximum prisoner unsuitable under subdivision (b), need not determine if subdivision (a) might otherwise apply.

The word "normally," as used in subdivision (a) of section 3041, may denote a legislative assumption, or hope, that uniform release dates would be a typical or common result for indeterminate life inmates (see fn. 8, *ante*). But, as we have seen, the Legislature provided an express "public safety" exception and

---

[8] Webster's Third New International Dictionary (2002 ed.) most pertinently defines "normal" as "2: according to, constituting, or not deviating from an established norm, rule, or principle" and "5: relating to or conforming with long-run expectations . . . " (*id.,* p. 1540, col. 2), and "normally" as "1: in a normal manner: to a normal degree" and "2: COMMONLY, USU-ALLY . . . : in normal circumstances; under normal conditions" (*id.,* cols. 2–3). The American Heritage Dictionary (4th ed. 2000) most pertinently defines "normal" as "1. Conforming with, adhering to, or constituting a norm, standard, pattern, level, or type; typical." (*Id.,* p. 1199, col. 2.)

placed that determination within the Board's broad discretion. Moreover, both the Legislature and the voters have otherwise indicated, in multiple ways, their abiding concern that the Board not schedule the release of *any* life-maximum prisoner who is still dangerous. A conclusion that section 3041, subdivision (a), *ever* requires the Board to fix such a prisoner's parole date, under principles of the term "uniform[ity]," *despite* the Board's factually supported belief that the particular circumstances of the inmate's crime indicate a continuing public danger would contravene this clear policy.[9]

The historical circumstances in which section 3041 was enacted further illuminate the statute's purpose and effect, including its use of the phrase "shall normally set a parole release date." (*Id.*, subd. (a).) As indicated above, under the pre-1977 sentencing regime, almost all convicted felons received indeterminate terms, often with short minimums and life maximums. (Cassou & Taugher, *supra*, 9 Pacific L.J. 5, 6–9.) Within this broad range, the parole authority was given virtually unbridled statutory power to "determine and redetermine, after the actual commencement of the imprisonment, what length of time, if any, such person shall be imprisoned" (former § 3020), and "to allow prisoners . . . to go upon parole outside the prison walls and enclosures" (§ 3040). Over time, it became the parole authority's practice simply to defer term-length and parole-release decisions until it "developed the feeling [in each individual case] that the prisoner was 'ready to go home.' " (Cassou & Taugher, *supra*, at p. 9.)

This system came into disfavor for many reasons. Not the least were complaints that it (1) failed to fit the punishment to the crime and (2) gave inmates no advance hope of a fixed date for release, thus actually promoting disciplinary problems within the prisons. Increasing disenchantment with the indeterminate sentencing scheme led to the introduction of Senate Bill No. 42 (1975–1976 Reg. Sess.) (Senate Bill No. 42), which, after a tortuous legislative process, became the DSL. (Cassou & Taugher, *supra*, 9 Pacific L.J. 5, 6–13.)[10]

---

[9] Our attention is called to Chief Justice Bird's concurring and dissenting opinion in *People v. Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115]. There, arguing that persons sentenced to death are entitled, as a matter of equal protection, to comparative sentence review, the author observed that both DSL sentencees (under former subdivision (f)(1) of section 1170) and indeterminate life prisoners (under section 3041, subdivision (a)) received some form of such review, which "guarantee" had been implemented, in the latter instance, by the Board's parole regulations. (*Allen, supra*, at p. 1295, fn. 5 (conc. & dis. opn. of Bird, C. J.).) The opinion was not directly concerned with the interaction between subdivisions (a) and (b) of section 3041, and did not discuss that interplay. Hence, it has no persuasive force here.

[10] Senate Bill No. 42 was passed by the 1976 Legislature, and was slated to become operative on July 1, 1977. In its 1977 session, the Legislature enacted, as an urgency matter, Assembly Bill No. 476 (1977–1978 Reg. Sess.), a so-called cleanup measure that modified and

Contemporaneous court decisions and administrative developments, addressing problems in the indeterminate sentencing law, further influenced the final shape of Senate Bill No. 42. First, the Adult Authority (as the parole authority was then known) acted on its own to meet some of the reformers' criticisms. "In April [1975], Chairman's Directive 75/20 was issued creating a structure for setting parole dates based on listed ranges and factors. Following this directive, numerous hearings were conducted to abolish the practice of deferring a decision on parole and to establish fixed parole dates for almost all inmates." (Cassou & Taugher, *supra*, 9 Pacific L.J. 5, 14.)

Then the courts entered the arena. *People v. Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001] (*Wingo*), held that, depending on the particular circumstances of the offense, a life-maximum sentence for assault with force likely to produce great bodily injury (§ 245, subd. (a)) might be so grossly disproportionate as to violate the cruel or unusual punishment clause of the California Constitution. (*Wingo, supra*, at pp. 175–180.) However, *Wingo* ruled, a constitutional challenge to the proportionality of an individual indeterminate sentence should await the Adult Authority's fixing of an actual release date for the inmate. If such a date was promptly set, *Wingo* concluded, proportionality would be measured by that date, rather than the statutory maximum. (*Id.* at p. 183.)

*In re Rodriguez* (1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 537 P.2d 384] (*Rodriguez*) expanded upon the constitutional proportionality of sentences, and the Adult Authority's term-fixing responsibilities, under the indeterminate sentencing law. There, an inmate had received the statutory sentence of one year to life for a single incident of lewd and lascivious conduct upon a child under 14 (§ 288). The evidence indicated his developmental disability was a prime factor in the offense. His prison conduct was exemplary, and he exhibited no traits of inherent criminality. Yet he had been in prison for 22 years without a decision by the Adult Authority about the length of his term or his readiness for parole.

By an analysis parallel to that in *Wingo*, *Rodriguez* held that a life-maximum sentence for lewd conduct could be constitutionally disproportionate to an individual offender's culpability. In the case at bar, said *Rodriguez*, the 22 years the inmate had already served was excessive. Moreover, *Rodriguez* reasoned, because of the general problem of "as applied" disproportionality under the indeterminate sentencing law, that law must be construed as *requiring* the Adult Authority to set actual maximum terms for all

---

adjusted numerous provisions of the original law. (See Stats. 1977, ch. 165, §§ 1–100, pp. 639–680.) The "cleanup" bill also became operative on July 1, 1977. Assembly Bill No. 476 made minor revisions to section 3041 (see Stats. 1977, ch. 165, § 45, pp. 666–667), but no amendments to that section, then or since, have altered the statute's language in ways pertinent to the issue before us.

inmates, proportionate to their individual culpability. *Rodriguez* stressed that the Adult Authority's responsibility to fix an inmate's maximum term, derived from former section 3020, was distinct from its power under section 3040 to decide if and when the prisoner was ready for conditional release. Thus, *Rodriguez* concluded, the inmate who had made good progress in prison could be granted parole before the end of his maximum term, as fixed by the Adult Authority, but in any event must be released upon expiration of that maximum term. (*Rodriguez, supra,* 14 Cal.3d 639, 646–653.)

Finally, in January 1976, *In re Stanley* (1976) 54 Cal.App.3d 1030 [126 Cal.Rptr. 524] held that the 1975 Adult Authority regulations, Chairman's Directive 75/20, were invalid because they based the parole release dates for indeterminate sentencees "primarily upon the nature of the principle commitment offense, supplemented by mathematical increments for additional precommitment offenses." (*Stanley, supra,* at p. 1038.) This approach, the Court of Appeal said, violated the Adult Authority's duty to consider *all* factors relevant to the inmate's suitability for parole. Citing *In re Minnis* (1972) 7 Cal.3d 639 [102 Cal.Rptr. 749, 498 P.2d 997], the Court of Appeal indicated that, under the pre-1977 indeterminate sentencing law, these factors prominently included the inmate's postcommitment conduct and his progress toward rehabilitation. (*Stanley, supra,* at pp. 1039–1041.)

Adoption of the DSL, with its fixed statutory terms followed by mandatory parole, resolved many of these issues with regard to the majority of felons. But the problem of parole and term-setting standards remained for those serious offenders who, under the DSL, would retain indeterminate life-maximum sentences. Section 3041 sought "for the first time [to establish] specific procedures . . . for parole consideration" for these offenders. (Parnas & Salerno, *The Influence Behind, Substance and Impact of the New Determinate Sentencing Law in California* (1978) 11 U.C. Davis L.Rev. 29, 33.)

In section 3041, the Legislature partially combined the term-setting and parole functions *Rodriguez* had described as separate under prior law. Under subdivision (a), firm parole release dates, fixed in advance under principles of uniform incarceration for similar offenses, would define the actual terms of imprisonment for eligible life prisoners. (See *Jefferson, supra,* 21 Cal.4th 86, 95–96.) But subdivision (b) of the statute made clear that the parole authority would have the express power and duty, in an individual case, to *postpone* the fixing of a firm release date, and thus to continue the inmate's *indeterminate* status within his or her life-maximum sentence, if it found that the circumstances of the prisoner's crime or criminal history presented a continuing risk to public safety. As explained above, nothing in section 3041, then or now, says the Board must compare the offender's crime

with others before making that determination, and other parole statutes establish the paramount concern for public safety in each life prisoner's case.[11]

Our interpretation of section 3041 comports with the Board's own longstanding construction of the statute. As indicated above, the Board's Regulations specify that, when considering parole for a particular indeterminate life inmate, the Board shall *first* determine suitability and shall set a base term (thus establishing a parole release date) *if* the prisoner is deemed suitable for parole. (Cal. Code Regs., tit. 15, §§ 2402, subd. (a), 2403, subd. (a); see also *id.*, §§ 2422, subd. (a), 2423, subd. (a), 2432, subd. (a), 2433, subd. (a).) The regulations specify numerous factors the Board is to consider in determining whether the prisoner is suitable—i.e., safe—for parole, including the nature of the commitment offense and the offender's criminal history. However, they nowhere indicate that the Board must determine an individual inmate's suitability by reference to other offenders of the same class, or to the minimum statutory term for the inmate's offense. (*Id.*, § 2402, subds. (b)–(d); see also *id.*, §§ 2422, subds. (b)–(d), 2432, subds. (b)–(d).)

In more than 25 years, despite numerous amendments to California's sentencing and parole laws, the Legislature has not disturbed the Board's interpretation of section 3041 in this fundamental regard. Under the particular circumstances, we find persuasive evidence that the Legislature has thus acquiesced in the Board's construction.

In 2001, the Legislature indicated its close attention to issues raised by this statute when it adopted substantial amendments to section 3041. Senate Bill No. 778 (2001–2002 Reg. Sess.) (Senate Bill No. 778), sponsored by Senator Burton, added subdivision (d) to section 3041, and modified subdivision (b). (Stats. 2001, ch. 131, § 2.) New subdivision (d) sought to help the Board

---

[11] The drafting progress and written legislative history of section 3041 do not undermine our construction. As originally introduced on December 2, 1974, Senate Bill No. 42 simply proposed technical amendments to section 1168, the basic indeterminate sentencing law. As amended by the Senate on March 17, 1975, the bill took new form as a determinate sentencing scheme. In this version, section 3041 provided that an indeterminate sentencee would meet with a parole panel one year before the minimum eligible parole date, at which time the panel "shall normally" set a release date, but that the panel "may decline" to set a date if the inmate's offense or criminal history presented public safety risks, or if the inmate's mental incompetence prevented such action. (Sen. Amend. to Sen. Bill No. 42, Mar. 17, 1975, § 281.) An Assembly amendment of August 7, 1975, altered section 3041 to near its current version, replacing the "may decline" language with a provision that a release date "shall [be] set . . . unless" the parole panel finds that the inmate's offense or criminal history are such that consideration of the public safety requires longer incarceration. (Assem. Amend. to Sen. Bill No. 42, Aug. 7, 1975, § 281.) The August 7, 1975, amendment also added the current requirement that release dates be set under principles of uniformity, pursuant to formal sentencing criteria, and eliminated mental incompetence as a ground for denying parole. We see no substantive difference between the original draft's provision that the parole authority "may decline," for specified reasons, to set a release date, and the current provision that the parole authority shall set a date "unless" specified reasons preclude that action.

clear up a backlog of inmates awaiting parole hearings by providing, for an emergency period ending December 31, 2003, that hearing panels could consist of only two persons, with only one "full" parole commissioner participating.[12]

Senate Bill No. 778 also altered subdivision (b) of section 3041—a subdivision directly at issue in this case. Then, as now, section 3041, subdivision (a) provided in part that "any person on the hearing panel may request review of any decision regarding parole to the full Board for an en banc hearing. In case of a review, a majority vote of the full [Board] in favor of parole is required to grant parole to any prisoner." Without altering subdivision (a), the bill added language to subdivision (b) to provide that (1) a panel decision finding an inmate *suitable* for parole is final unless overturned by the full Board within 120 days, and (2) such a panel decision may not be overturned and ordered reheard by the full Board except (a) after consultation with the commissioners who participated in the panel decision, (b) by a majority vote, taken after a public hearing, and (c) upon findings that the panel committed material errors of law or fact, or because of material new information bearing on the inmate's suitability.

The legislative history of Senate Bill No. 778 indicates that new section 3041, subdivision (d) was inspired by anecdotal information that the backlog of inmates with overdue hearings had grown to 2,000, causing more than one-year delays in individual hearings, with the result that inmates with so-called one-year denials were waiting two years for their next parole hearings. (See, e.g., Assem. Com. on Pub. Safety, analysis of Sen. Bill No. 778 (2001–2002 Reg. Sess.) as amended June 21, 2001, p. 5; Assem. Com. on Appropriations, analysis of Sen. Bill No. 778 (2001–2002 Reg. Sess.) as amended June 21, 2001, p. 2.)

The amendment to section 3041, subdivision (b), according to Senator Burton, was prompted by "anecdotal information . . . that [the Board] is referring favorable parole suitability decisions for re-hearing by a parole hearing panel other than the panel that determined parole suitability. This is being done without consulting the commissioners who decided that the inmate was suitable for parole. [While] [the Board] does have guidelines for review of a parole decision by the entire Board, . . . this process is being by-passed by the re-hearing process." (Assem. Com. on Pub. Safety, analysis of Sen. Bill No. 778 (2001–2002 Reg. Sess.) as amended June 21, 2001, p. 6; Assem. Com. on Appropriations, analysis of Sen. Bill No. 778 (2001–2002 Reg. Sess.) as amended June 21, 2001, p. 4.)

---

[12] Subdivision (a) of section 3041 otherwise provides that panels must consist only of "full" or "deputy" commissioners, with at least two "full" commissioners on each panel.

Thus, the Legislature recently examined the process by which parole hearings were conducted and reviewed, and it altered that process for the apparent purpose of providing additional protection to indeterminate life inmates who were overdue for hearings, or who have received *favorable* suitability determinations. Despite its concern in these areas, however, the Legislature did nothing to countermand the Board's regulations to the effect that (1) an inmate must be *found* suitable *before* a release date is set and (2) a hearing panel may find an inmate *unsuitable* for parole, as a public safety risk, without comparing his offense, or his resulting period of confinement, to other cases. On the contrary, the 2001 amendment to subdivision (b) appears to *assume* that mode of procedure.[13]

Mere inaction is not conclusive evidence that the Legislature agrees with long-standing administrative and judicial construction of a statute. But given the Legislature's recent attention to closely related subjects, we believe that its failure to intervene against the well-established Board policy at issue here is a significant indicator that we have properly divined the legislative intent. (See, e.g., *People v. Martinez* (1995) 11 Cal.4th 434, 445–446 [45 Cal.Rptr.2d 905, 903 P.2d 1037]; *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235, & fn. 7 [5 Cal.Rptr.2d 782, 825 P.2d 767] [noting that the doctrine of legislative acceptance of an administrative construction of a statute may be applied where the agency construction "is one of such long standing that the Legislature may be presumed to know of it"].)[14]

We also note the adverse public policy implications of accepting the Court of Appeal's interpretation. In the first place, by requiring intercase comparisons in every parole matter, it would contribute significantly to backlogs like

---

[13] Senate Bill No. 778 was signed into law on July 30, 2001, and became effective immediately. As indicated above, all available appellate authority then confirmed that, under section 3041, a finding of individual suitability must precede the setting of a "uniform" parole release date. *Ramirez, supra,* 94 Cal.App.4th 549, the first published appellate case to cast doubt on this premise, was not decided until more than four months later, on December 12, 2001. Hence, there can be no claim that the Legislature approved, or acquiesced in, *Ramirez*'s interpretation of section 3041.

[14] Dannenberg takes issue with the premise that the Board has consistently interpreted section 3041 in this manner. He supplies, and cites, superseded 1977, 1978, and 1979 versions of the Board's parole regulations for indeterminate life prisoners. However, these documents belie his argument. Though the superseded regulations are not worded identically to the current version, or to each other, they advance the consistent principle that a determination of suitability for parole, based on public safety factors individual to the offense and offender, shall precede any effort to set a release date under principles of uniformity. (See Cal. Code Regs., tit. 15, Cal. Reg. Notice Register 77, No. 28, former §§ 2280–2283, pp. 228–229; *id.*, Register 78, No. 14, former §§ 2280–2283, pp. 230–230.1; *id.*, Register 79, No. 24, former §§ 2280–2281, pp. 230.1–230.2.)

the one Senate Bill No. 778 sought to alleviate. Such a process seems likely to convert *each* proceeding into a comparative review of *every* proceeding.[15]

Even more significantly, the Court of Appeal's construction could force the Board to schedule the release of inmates serving statutory life-maximum sentences—penalties now reserved for serious offenders, including murderers—despite the Board's reasonable belief that the particular circumstances of their commitment offenses indicated a continuing risk to the community at large. For the multiple reasons set forth above, we are convinced the Legislature did not wish section 3041 to operate in that way.

Though the dissent contends otherwise, our conclusion does not contravene *Rosenkrantz, supra,* 29 Cal.4th 616. There we addressed the scope of the Governor's authority, under article V, section 8, subdivision (b) of the California Constitution, to reverse the Board's grant of parole to an inmate serving an indeterminate life sentence for murder. Among other things, we stressed that, although the Governor may make an independent decision on the record, he is limited, in determining the inmate's suitability for parole, to "the same considerations that inform the Board's decision." (*Rosenkrantz, supra,* at p. 661.)

In that regard, we noted that "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations.]" (*Rosenkrantz, supra,* 29 Cal.4th 616, 682.) While neither the Board nor the Governor may adopt a blanket no-parole policy for particular offenses, we said, "the [parole] authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant." (*Id.,* at p. 683.)

However, we cautioned, sole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date "shall normally be set" under "uniform term" principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, "for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that

---

[15] The Board's uniform-term "matrices" are an effort to systematize such comparisons to some degree. Still, the decision where every single inmate's case might fit on the appropriate matrix, and what aggravating and mitigating factors might distinguish it from other cases in that matrix category, would require considerable new effort and judgment from already overburdened hearing panels.

On a related subject, the dissent suggests that if the Board believes the 15-to-21-year terms contemplated by the current "matrix" for second degree murderers are too brief to protect public safety, it may amend the matrix. We agree that the Board is free to take this step. But the Board's acknowledged authority in this regard does not detract from its statutory obligation to independently assess the suitability of each individual parole candidate before deciding to set a release date for that inmate.

offense." (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.) Quoting *Ramirez, supra,* 94 Cal.App.4th 549, 570, we suggested that, in order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should "normally" be granted, an offense must be "particularly egregious" to justify the denial of parole. (*Rosenkrantz, supra,* at p. 683.)

In *Rosenkrantz,* we pointed out, the Governor had stressed "circumstances of [the] petitioner's offense . . . that involve particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder. Accordingly, the Governor properly could consider the nature of the offense in denying parole." (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.)

*Rosenkrantz* did not say the parole authority must routinely subordinate suitability to uniformity, refer to its "base term" matrices, or otherwise engage in a comparative analysis of similar offenses before deeming a particular life inmate unsuitable, on grounds of public safety, to receive a parole date. Our discussion, including our use of the phrase "particularly egregious," conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined. (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.)

Here, as in *Rosenkrantz,* the parole authority pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder. As the Board noted, Dannenberg reacted with extreme and sustained violence to a domestic argument. He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then "fell or was pushed" into a bathtub full of water, where she drowned. Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead. The parole panel's questions to Dannenberg showed its reasonable skepticism about his surmise that, while he was briefly unconscious during their struggle, the victim crawled to the tub, placed her face under the faucet, accidentally struck her head on the tap, and fell into the water.

Thus, there clearly was "some evidence" (*Rosenkrantz, supra,* 29 Cal.4th 616, 658) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[16]

---

[16] The dissent insists our construction of section 3041 ignores the Legislature's intended distinctions, for purposes of punishment, between first and second degree murders, and among more and less aggravated murders within each degree. Moreover, the dissent suggests we

 Of course, even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement, we have held, violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution. (*Rodriguez, supra,* 14 Cal.3d 639, 646–656; *Wingo, supra,* 14 Cal.3d 169, 175–183.) Thus, we acknowledge, section 3041, subdivision (b) cannot authorize such an inmate's retention, even for reasons of public safety, beyond this constitutional maximum period of confinement.

However—and though Dannenberg contends otherwise—we do not believe, under the current statutory scheme, that such constitutional considerations impose upon the Board a general obligation to fix actual maximum terms, tailored to individual culpability, for indeterminate life inmates. Our prior ruling that the parole authority had such a general duty was influenced by the nature and provisions of the more comprehensive indeterminate sentencing system then in effect.

As noted above, this prior scheme subjected most convicted felons to a broad disparity between their statutory minimum and maximum periods of confinement, and it imposed life maximums for a wide range of offenses, serious and less serious. Moreover, the statutory scheme vaguely empowered the parole authority both to fix an inmate's actual maximum term and to grant

permit untethered, pro forma parole denials that are insulated from effective judicial review, thus contravening California life inmates' due process rights to individualized parole consideration.

As we have explained, however, the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See § 3041, subd. (b); Cal. Code Regs., tit. 15, § 2402.) When the Board bases unsuitability on the circumstances of the commitment offense, it must cite "some evidence" of aggravating facts *beyond the minimum elements of that offense.* (*Rosenkrantz, supra,* 29 Cal.4th 616, 658, 683.)

Here, the Board adhered to these limits. The parole panel conducted a substantial hearing, giving its close attention to Dannenberg's testimony in his own behalf. The panel then clearly articulated its reasons, described above, for concluding that the evidence indicated an "especially callous and cruel" murder. There can be little doubt that the supportable inferences drawn by the panel suggest callousness beyond the minimum elements of second degree murder.

As we have seen, the Board has always enjoyed broad parole discretion with deferential judicial oversight. But these well-established principles do not deny due process. On the contrary, they define and limit the expectancy in parole from a life sentence to which due process interests attach. (See fn. 19, *post.*) ·

Finally, the dissent wrongly insinuates that dangerous murderers sentenced to indeterminate life terms are entitled to earlier release simply because their *convictions* are in the second rather than the first degree. On the contrary, the parole authority may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences. (*Rosenkrantz, supra,* 29 Cal.4th 616, 678–679 [parole authority may credit evidence that one convicted only of second degree murder acted with premeditation and deliberation].)

earlier parole. Nonetheless, the authority had adopted the practice of deferring all such decisions until it deemed the inmate ready for release. As a result, the possibility arose that a large number of California prisoners were being exposed to excessive punishment for their individual crimes—a situation the parole authority could remedy in many cases simply by fixing maximum terms.

Accordingly, *Wingo* held that "cruel or unusual punishment" challenges to individual indeterminate sentences should await the parole authority's prompt fixing of the actual maximum term in each case. (*Wingo, supra,* 14 Cal.3d 169, 183.) *Rodriguez* further ruled that the authority was *required* to set a maximum term for every indeterminate sentencee, tailored to his or her individual culpability. (*Rodriguez, supra,* 14 Cal.3d 639, 651–653.)

Different considerations apply under current law. In contrast with the prior situation, the number of persons now serving indeterminate life-maximum sentences, while substantial, is but a fraction of California's prison population. And, unlike the former system, which imposed life maximums for a broad range of offenses, the current scheme reserves such sentences for a much narrower category of serious crimes and offenders.[17] Moreover, as we have explained, section 3041 expressly instructs the Board to set an indeterminate life prisoner's parole release date—the equivalent of term-setting in such cases—*unless* it finds that the aggravated nature of the inmate's offense or criminal history raises public safety considerations warranting longer incarceration for that inmate. All these factors diminish the possibility that the Board's refusal, under section 3041, subdivision (b), to set parole release dates in individual cases will result in the de facto imposition of constitutionally excessive punishment, or will overwhelm the courts' ability to assess claims of constitutional disproportionality.

■ As we indicated in *Wingo, supra,* 14 Cal.3d 169, "traditionally 'one who is legally convicted has no vested right to the determination of his sentence at less than maximum' [citation]. Moreover, 'a defendant under an indeterminate sentence has no "vested right" to have his sentence fixed at the term first prescribed by the [parole authority] "or any other period less than the maximum sentence provided by statute." ' [Citations.] 'It has uniformly been held that the indeterminate sentence is in legal effect a sentence for the

---

[17] (See, e.g., offenses listed in *Jefferson, supra,* 21 Cal.4th 86, 92–93, & fn. 2; see also, e.g., §§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A) [felony conviction with two or more prior serious or violent felony convictions; up to 25 or more years to life]; § 667.51, subd. (d) [lewd and lascivious conduct upon child under 14 with two prior convictions for specified sex offenses; 15 years to life]; § 667.61 [specified sex offenses committed under specified aggravating circumstances; life imprisonment with no parole eligibility for 15 or 25 years]; § 12022.53, subd. (d) [personal and intentional infliction by firearm of death or great bodily injury in commission of specified serious felonies; 25 years to life].)

maximum term' [citation], subject only to the ameliorative power of the [parole authority] to set a lesser term. [Citations.]" (*Id.* at p. 182.) Indeed, " 'it is fundamental to [an] indeterminate sentence law that every such sentence is for the [statutory] maximum unless . . . the [parole] authority acts to fix a shorter term. The authority may act just as validly by considering the case and then declining to reduce the term as by entering an order reducing it . . . .' " (*Id.* at pp. 182–183; see also *Rosenkrantz, supra,* 29 Cal.4th 616, 655; *In re Minnis, supra,* 7 Cal.3d 639, 646.)

As indicated, the current statute *requires* the Board to act in each case, either by setting a parole release date, or by expressly declining to do so for reasons of public safety. Constitutional rights are thus adequately protected by holding that those indeterminate life prisoners who have been denied parole dates, and who believe, because of the particular circumstances of their crimes, that their confinements have become constitutionally excessive as a result, may bring their claims directly to court by petitions for habeas corpus. Implementation of the cruel or unusual punishment clause, as construed in *Wingo* and *Rodriguez,* does not require the Board, under current law, to set premature release dates for current life-maximum prisoners who, it believes, present public safety risks. Dannenberg makes no direct claim that the approximately 18 years he has spent behind bars is constitutionally disproportionate to his second degree murder.

We therefore hold that the Board proceeded lawfully when, without comparing Dannenberg's crime to other second degree murders, to its base term matrices, or to the minimum statutory prison term for that offense, the Board found him unsuitable to receive a fixed and "uniform" release date by pointing to some evidence that the particular circumstances of his crime— circumstances beyond the minimum elements of his conviction—indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.[18]

In his brief on the merits in this court, Dannenberg has also urged that the Board erred by basing its denial of parole, in part, on its conclusion that he

---

[18] Our conclusion that California's parole statutes allow the Board to find unsuitability without engaging in a comparative analysis of other offenses or applying "uniform term" principles, and that the Board adhered to state law in Dannenberg's case, also disposes of his contention that he was denied federal due process rights arising from his protected liberty interest, and expectation, in a "uniform" parole release date. (See, e.g., *Board of Pardons v. Allen* (1987) 482 U.S. 369 [96 L.Ed.2d 303, 107 S.Ct. 2415]; *Rosenkrantz, supra,* 29 Cal.4th 616, 661.) As Dannenberg concedes, he has such a liberty interest and expectation only to the extent that state law provides it. Aside from his argument that the Board's decision lacked the support of "some evidence"—a contention we have rejected—Dannenberg does not contend he was denied any *procedural* rights he was constitutionally due in the course of the Board's decision. (Cf., e.g., *In re Sturm* (1974) 11 Cal.3d 258, 265–272 [113 Cal.Rptr. 361, 521 P.2d 97]; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 903–912.)

"needs to accept full responsibility for the crime . . . and discontinue his efforts to minimize his responsibility for that." The Board's reference, as Dannenberg notes, was apparently to his continued insistence that, while he struck his wife repeated blows with the pipe wrench, thus setting in motion events that led to her death, he did not directly cause or facilitate her drowning. By using his refusal to admit he drowned his wife as a basis for denying parole, Dannenberg urges, the Board violated section 5011(b), which provides that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."[19]

We need not consider the technical validity of Dannenberg's argument, for we conclude that any error by the Board in this respect was harmless. It appears manifest that the Board's reference to Dannenberg's failure to take responsibility was peripheral to its decision and did not affect the outcome.

Thus, in its oral ruling in 1999, the parole panel made clear that the "primary reason" for its denial ruling was the exceptionally callous and cruel nature of the commitment offense itself. Indeed, it is not clear that the 1999 decision to deny parole *at that time* was premised *to any extent* on Dannenberg's failure to accept full responsibility for his role in his wife's death.

In its 1999 ruling, the panel first denied parole, citing only the circumstances of the commitment offense and Dannenberg's need for further therapy. Then, in a self-described "separate decision," the panel further found it was not reasonable to expect parole *would* be granted sooner than two years hence. (See § 3041.5, subd. (b)(2)(A) [after denying parole, Board may schedule next hearing two years later, rather than one, if it states, with supporting findings, that it is unreasonable to expect parole would be granted during the following year].) In support of *this latter* decision, the panel cited the nature of the offense, Dannenberg's need for further "programming" (apparently, therapy), and his failure to accept full responsibility. The validity of the panel's decision to defer a new parole hearing for two years is not before us.

---

[19] The Board insists this issue has not been preserved for our consideration, because Dannenberg did not raise it in his answer to the Board's petition for review (see Cal. Rules of Court, rule 28(a)(2)), and it is not fairly within the scope of the issues set forth in our order granting review (*id.*, rule 29(a)(1), (b)(1), (2)). But we question whether Dannenberg was required to raise, in his answer, an issue upon which he prevailed both in the superior court and in the Court of Appeal, and which the Board—the losing party on the point in all courts below—did not include in its petition for review. The Board had the opportunity to respond on the merits to Dannenberg's claim in its reply brief in this court, though it opted not to do so. Moreover, we are reluctant to issue a straight reversal of the Court of Appeal's judgment—thus effectively reinstating the Board's order denying parole—without examining all bases upon which Dannenberg has claimed, both here and below, that the Board's order is defective. We therefore address Dannenberg's argument.

We may uphold the parole authority's decision, despite a flaw in its findings, if the authority has made clear it would have reached the same decision even absent the error. (See *Rosenkrantz, supra,* 29 Cal.4th 616, 677, 682.) In our view, the Board has done so here. Accordingly, we conclude that the instant panel's mistake, if any, does not invalidate its decision denying parole, and does not preclude reinstatement of the Board's order.

## DISPOSITION

The Court of Appeal's judgment is reversed. *In re Ramirez, supra,* 94 Cal.App.4th 549, is disapproved to the extent it conflicts with the views expressed in this opinion.

George, C. J., Chin, J., and Brown, J., concurred.

**MORENO, J.**—I dissent. Second degree murder, of which petitioner John E. Dannenberg stands convicted, is by its very nature a serious crime. But as explained below, the relevant statute mandates that people convicted of second degree murder be considered for and normally granted parole. At the very least, the statute mandates that the Board of Prison Terms (Board) not deny parole solely because the prisoner has committed the murder. Yet the majority's decision today would permit the Board to do precisely that. And though the majority does so in the name of public safety and individualized parole decisions, the majority opinion in fact advances neither goal. Rather, the position the majority adopts requires the judicial rubber stamping of the Board's decisions, no matter how unfounded or unjust they might be.

There is, as the majority notes, a tension between Penal Code section 3041, subdivisions (a) and (b)[1] (hereinafter section 3041(a) and section 3041(b)). But "the function of the court in construing a statute 'is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.' (Code Civ. Proc., § 1858.)" (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 492 [66 Cal.Rptr.2d 304, 940 P.2d 891].) The majority fails to perform this basic function, reaching its result by ignoring or discounting much of section 3041(a).

Specifically, the majority concludes that section 3041(a)'s statement that the Board "shall *normally* set a parole release date . . . in a manner that will provide *uniform terms for offenses of similar gravity and magnitude* in

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

respect to their threat to the public" (italics added) has no real meaning, and is nothing more than a "legislative assumption, or hope, that uniform release dates would be a typical or common result." (Maj. opn., *ante*, at p. 1087.) The majority accordingly holds, in effect, that "normally" can mean "almost never" and the Board can disregard the statutory mandate that parole dates be set proportionally in relation to the magnitude of the offense. Instead, the majority advances the position that the Board is governed by section 3041(b) to the exclusion of section 3041(a). Section 3041(b) provides, in pertinent part: "The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." What the majority does not and cannot explain is why the Legislature should go through the trouble of describing extensively a method of granting parole that the Board "shall" carry out if this statute expresses—very uncharacteristically for a Legislature—nothing more than a "hope."

In addition to section 3041's mandate to set uniform, proportional parole release dates, the Legislature has established minimum terms before parole may be granted, generally 15 years in the case of second degree murder and 25 years in the case of noncapital first degree murder. (§ 190, subd. (a).) In so doing, the Legislature has implicitly made the judgment that parole for the least serious second degree murders should be set at that minimum term, and that parole for more aggravated second degree murders should be set accordingly. But under the majority's position of following section 3041(b) without any reference to 3041(a), the Board need not concern itself with the relative gravity of the underlying offense. Thus, the Board appears free to erase the fundamental legislative distinction between first and second degree murder, and to routinely compel the person convicted of the latter to serve as much time as one convicted of the former.

The Court of Appeal's opinion below, and the opinion in *In re Ramirez* (2001) 94 Cal.App.4th 549 [114 Cal.Rptr.2d 381] (*Ramirez*), set forth the most sensible way to interpret the statutory scheme that gives effect, as we must, to the entire statute. Because section 3041(a) requires the Board to "normally" set parole dates for life prisoners, and to establish a uniform, proportional scheme for parole setting that is protective of public safety, section 3041(b) must be understood as providing an exception to section 3041(a) in the "abnormal" circumstance when the gravity of the offense is so aggravated that a parole date cannot be set pursuant to section 3041(a). (*Ramirez, supra,* 94 Cal.App.4th at pp. 569–570.)

One thing that makes the majority's opinion particularly perplexing is that we recently endorsed this very position, which the majority now repudiates,

in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*). As the Chief Justice, writing for the court, stated: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' (Pen. Code, § 3041, subd. (a).) 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' (*In re Ramirez, supra*, 94 Cal.App.4th at p. 570.)" (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

The majority attempts to minimize the significance of *Rosenkrantz*. It states: "Our discussion, including our use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (Maj. opn., *ante*, at p. 1095.) But we said more than that. As indicated above, we stated: " 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate *so as to swallow the rule that parole is "normally" to be granted*. Otherwise, the Board's case-by-case rulings would *destroy the proportionality contemplated* by Penal Code section 3041, subdivision (a) . . . .' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 683, italics added.)[2]

The majority's standard is not only inconsistent with the pertinent statute and with *Rosenkrantz*, it does not articulate a workable standard of judicial review. This deficit is brought home by the way in which it deals with the case before us. Having concluded that "particularly egregious" means "the

[2] In *Rosenkrantz*, we found that certain circumstances of the offense, per se, constituted egregious conduct in comparison to other second degree murders, i.e., there was considerable evidence that the crime was committed with premeditation and deliberation sufficient for a finding of first degree murder. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 678–679.)

violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined," (maj. opn., *ante*, at p. 1095.) the majority proceeds to review the facts of the case. "As the Board noted, Dannenberg reacted with extreme and sustained violence to a domestic argument. He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then 'fell or was pushed' into a bathtub full of water, where she drowned. Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead. . . . ." (Maj. opn., *ante*, at p 1095.) The majority then states, conclusorily: "Thus, there clearly was 'some evidence' (*Rosenkrantz, supra*, 29 Cal.4th 616, 658) to support the Board's determination that Dannenberg's crime was 'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the 'trivial' provocation." (Maj. opn., *ante*, at p. 1095.)

This unexplained conclusion raises more questions than it provides answers. *What is it about these facts* that make this second degree murder particularly egregious? How is the Board to determine what facts constitute a particularly egregious murder? How is a court to review that determination? The majority gives us no clue, because the concept of a crime being "more than minimally necessary to convict [a prisoner] of the offense for which he is confined" (maj. opn., *ante*, at p. 1095) is essentially meaningless. Second degree murder is an abstraction that consists of certain legal elements. Particular second degree murders have *facts* that fit within these elements. These facts are never "necessary" or "minimally necessary"[3] to convict someone of a second degree murder, because we can always imagine other facts that would also lead to a second degree murder conviction. Furthermore, these facts, because they are facts about a second degree murder, will almost invariably involve the defendant acting violently, cruelly, and, if acting out of provocation, greatly out of proportion to the provocation (otherwise the defendant would have been convicted of manslaughter or exonerated through self-defense). If the Board labels a second degree murder "especially callous and cruel" and exhibiting "an exceptionally callous disregard for human suffering," then recites the

---

[3] It is true that the majority plucks the phrase "minimally necessary" from *Rosenkrantz*. But, as quoted above, that phrase appears in *Rosenkrantz* in a passage that recognizes the Board's obligation to normally, uniformly and proportionally set parole dates. (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) The unmistakable meaning of the *Rosenkrantz* court in that context was that a second degree murder commitment offense cannot by itself be the basis for the denial of parole unless it is "particularly egregious" *for a second degree murder,* so that "the Board's case-by-case rulings [would not] destroy the proportionality contemplated by Penal Code section 3041, subdivision (a) . . . ." (*Rosenkrantz, supra*, 29 Cal.4th at p. 683, quoting *Ramirez, supra*, 94 Cal.App.4th at p. 570.) In other words, the phrase "minimally necessary" makes sense in the context in which it is used in *Rosenkrantz,* but not when it is taken out of context by the majority.

facts of the case, is there any way for a court to review that finding and, on occasion, to find it untrue? The majority provides no explicit answer. Its implicit answer appears to be "no."

The majority's implicit abolition of judicial review whenever the Board bases its parole denial decision on the commitment offense contravenes the limited but significant due process rights of parole applicants required by the California Constitution. (Cal. Const., art. I, § 7, subd. (a).) As the court has explained, an applicant has the right, " 'to have his application for [parole] "duly considered" based upon an individualized consideration of all relevant factors.' " (*Rosenkrantz, supra,* 29 Cal.4th at p. 655, quoting *In re Minnis* (1972) 7 Cal.3d 639, 646 [102 Cal.Rptr. 749, 498 P.2d 997].) In other words, the parole application must be given "something more than mere pro forma consideration." (*In re Sturm* (1974) 11 Cal.3d 258, 268 [113 Cal.Rptr. 361, 521 P.2d 97] (*Sturm*).) As we have stated: "Under time-honored principles of the common law, . . . the parole applicant's right to 'due consideration' cannot exist in any practical sense unless there also exists a remedy against their abrogation. (See *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 161–163 [2 L.Ed. 60].) Hence, our prior recognition of a right to due consideration of parole applications necessarily gives rise to a concomitant right to an available remedy." (*Sturm, supra,* at pp. 268–269.) It was the recognition of a parole applicant's due process rights and the need for an effective remedy for their violation that led this court to recently reaffirm that a parole denial decision could not be sustained unless supported by "some evidence." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 655–658.)

Under the majority's approach, if the Board gives the parole applicant mere pro forma consideration—reciting the facts of the case and then labeling the applicant's actions "especially callous and cruel"—a court will nonetheless be obliged to uphold the Board's decision. The banishment of judicial review from the parole process under these circumstances means the judiciary will be disabled from enforcing even the most rudimentary due process rights of parole applicants.

The possibility that the Board may not be giving individualized, due consideration to parole applicants is more than hypothetical. In 1999, for example, *no* life prisoners were released on parole, partly because the Board granted parole to an estimated 18 prisoners (Legis. Analyst's analysis of 2000–2001 Budget Bill, p. D-59) out of about 2,000 parole suitability hearings (<http://www.bpt.ca.gov/caseload_stats.asp> [as of Jan. 24, 2005]), less than 1 percent of those eligible, and partly because of the then Governor's even more stringent parole policy.

The Board's reluctance to grant parole is understandable, but troubling. Denial of parole may incur the wrath of the prisoner and his immediate

supporters. But granting parole to a prisoner who reoffends will incur the disapproval of society at large. (See Simerman, *Convicts Pin Hope on New Governor*, Contra Costa Times (Aug. 22, 2004) [discussing the political risks of granting parole].) The Board's commissioners therefore have little to gain and potentially much to lose by granting parole, and accordingly, the incentive to give only pro forma consideration to the parole decision is strong. This incentive makes meaningful judicial review all the more essential.

The majority primarily justifies its holding by means of section 3041's overriding concern with public safety. But using public safety to excuse the Board's failure to comply with its statutory mandate under section 3041(a) misses the mark for at least two reasons. First, section 3041(a) itself makes public safety concerns central, dictating that the "uniform terms for offenses of similar gravity and magnitude" be calibrated "in respect to their threat to the public." In other words, the Legislature has determined that for those convicted of second degree murder and first degree murder without special circumstances, the proportional, uniform setting of parole dates can and should be accomplished in a manner *consistent with* public safety. Although there are other individualized considerations pertaining to a prisoner's suitability for parole and his threat to public safety, such as his behavior in prison, his plans after prison, and his age (see Cal. Code Regs., tit. 15, § 2402), it is clear from section 3041(a) that the commission of a second degree murder that is not exceptional with respect to other second degree murders does not *by itself* provide a basis for failing to set a parole date.

In other words, no one is challenging the validity of the Board's regulation that "regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) But when a prisoner is denied a parole date solely as a result of the seriousness of the commitment offense, and all the postcommitment evidence points to the fact that he is no longer a danger to society, section 3041(a) and (b) dictates that the commitment offense be particularly egregious in comparison to other offenses of the same class. Despite the majority's profession to the contrary, there is no indication that proceeding in this manner will compromise public safety in the least, nor any indication that the Legislature believed it would.

Second, although public safety is paramount, the Legislature had other concerns, which the majority suggests in its discussion of the legislative history of the determinate sentencing law of which section 3041 is a part. There was the concern that the indeterminate sentence "gave inmates no advance hope of a fixed date for release, thus actually promoting disciplinary

problems within the prisons." (Maj. opn., *ante*, at p. 1088, citing Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 6–13.) There was also no doubt a concern with expending large sums of taxpayer money to keep in prison someone who has served his sentence and poses little risk to the public, as well as humanitarian concerns. The legislative scheme of normally and uniformly granting parole dates to those convicted of second degree murder reflects this legislative balancing of various concerns, which the majority, following the Board, ignores.

It is perhaps possible that the majority endorses the Board's way of conducting parole release because it seeks to avoid the undesirable result of the mass release of convicted murderers. I do not believe such mass release or anything like it will occur for several reasons. First, the approach of the Court of Appeal below and in *Ramirez*, quite properly, is to remand to the Board to require it to proceed in a correct manner, not necessarily to set a parole release date, as the trial court in this case would have done.

Second, and more fundamentally, the Board is still given a great deal of power under the Court of Appeal's interpretation of the statute. Its power comes from two sources. First, section 3041(a) gives it broad rulemaking authority for setting uniform, proportional parole release dates. The Board has established a matrix that appears to comply with the mandate, although it does not use that matrix for parole suitability determinations. The *Ramirez* court and the Court of Appeal below used the matrix because it reflects the Board's own effort at establishing a uniform, proportional parole release date scheme consistent with the intent of section 3041(a). But the Board is free to amend the current matrix if it reasonably believes that the sentences given therein, ranging from 15 to 21 years for second degree murderers, are too brief to protect the public. Second, the Board has the authority to interpret and apply its regulations. Here again, it is afforded great discretion, subject only to a "some evidence" standard, as well as to the constraint that it not proceed in an arbitrary and capricious manner. (See *Ramirez, supra*, 94 Cal.App.4th at pp. 563–564.) Third, as noted, there are and will be numerous instances in which the Board's parole suitability decision will be legitimately based in whole or part on matters other than the commitment offense, such as misconduct in prison and lack of realistic parole plans. (See Cal. Code Regs., tit. 15, § 2402.)

It should be emphasized that ranking the gravity of the commitment offense is no extraordinary task. In fact, the Board already applies its own

matrix to determine the seriousness of the offense when it sets a parole date. (Cal. Code Regs., tit. 15, § 2403.) Under the Board's matrix, for example, a second degree murder resulting from an indirect cause like a heart attack, and in which the victim was an accomplice, would rank among the least serious crimes, while a murder "calculated to induce terror in the victim" that was committed by someone with no personal relationship to the victim, would rank among the most serious. (*Ibid.*) Moreover, this kind of ranking of an offense based on aggravating and mitigating factors is what trial judges routinely are asked to do in making sentencing decisions. (See § 1170, subd. (b); Cal. Rules of Ct., Rules for Criminal Cases in the Superior Court, rule 4.413 [factors for determining base terms in determinate sentences]; *id.*, rules 4.420–4.423 [factors for determining eligibility for probation].) There is no reason to believe the Board would be unable to fulfill its statutory obligation.

The majority argues that the approach taken by the Court of Appeal in this case and in *Ramirez* would require "intercase comparisons in every parole matter" that "would contribute significantly to backlogs . . . . Such a process seems likely to convert *each* proceeding into a comparative review of *every* proceeding." (Maj. opn., *ante*, at pp. 1093–1094.) I disagree. Intercase comparisons are not required by section 3041, nor are they inherent in the principle of judicial review of parole suitability decisions. (Cf. former § 1170, subd. (f), as amended by Stats. 1977, ch. 165, § 15, p. 649 [requiring comparative review of determinate sentences].) All that is mandated is for the Board to follow its own regulations ranking the relative gravity of the crime committed, according to aggravating and mitigating circumstances that the Board itself has defined. Of course, under any interpretation of section 3041, a prisoner is free to argue that he or she should be granted parole based on parole granted in comparable cases. But as long as there is some evidence that the Board has complied with its own reasonable regulations, its decision denying a parole date should be upheld.

Several additional arguments made by the majority merit brief mention. First, the majority argues legislative acquiescence, particularly with regard to the 2001 amendments to section 3041 that adopted certain procedural changes to deal with the large backlog in the parole hearing system. Legislative acquiescence is the proverbial "weak reed," except when it is clear, or can be implied, that a particular administrative construction of a statute has come to the Legislature's attention. (See *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235 fn. 7 [5 Cal.Rptr.2d 782, 825 P.2d 767].) In *Robinson*, for example, the Legislature was presumed to be aware of certain

precedential, published decisions of the Fair Employment and Housing Commission. (*Ibid.*) The precise issue raised by this case—whether a prisoner could be denied the setting of a parole date in accordance with section 3041(a) based on a commitment offense that was not particularly egregious when compared to other offenses of the same class—was not the subject of any administrative or judicial decision until *Ramirez* discussed it at the end of 2001, after the enactment of the 2001 amendments. It is significant that *Ramirez* disapproved of no other Court of Appeal decision, no formal administrative decision, and no administrative rule. Rather, it disapproved of an administrative practice implicated in the case before it. There is no particular reason to believe the Legislature was focusing on that practice when it enacted the 2001 amendments or prior amendments to section 3041.

Second, the majority argues deference to administrative interpretation. The short response to this argument is that administrative practice or regulation inconsistent with its authorizing statute cannot stand, and courts must exercise their independent judgment to determine whether the administrative agency's practice or regulation complies with statute. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].) Moreover, deference is particularly owing when the statutory interpretation implicates administrative agency expertise. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12–13 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) There is no indication that the Board exhibits particular expertise regarding which prisoners constitute a threat to public safety or are otherwise suitable for parole. In this case, in fact, the record shows the Board disregarded the un contradicted findings of the experts who had evaluated Mr. Dannenberg.

Third, the majority discusses several statutes requiring notification to various parties of a parole hearing and providing them opportunity for input on parole decisions. The majority concludes that "these laws emphasize that the first responsibility of the parole authorities is to evaluate the suitability of an *individual* inmate for *safe* release . . . ." (Maj. opn, *ante,* at p. 1086.) But there is nothing incompatible about on the one hand requiring the Board to follow its own regulations defining when a commitment offense is particularly egregious, and on the other hand allowing the Board to consider information provided by the public relevant to a parole suitability determination. Nor is there anything incompatible about the Board following section 3041(a) and gubernatorial review of the Board's parole decision. Indeed, as *Rosenkrantz* makes clear, the Governor, like the Board, may not deny parole based solely on a commitment offense that is not "particularly egregious." (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

Turning to the present case, I agree with the trial court and the Court of Appeal that the Board's determination of Dannenberg's unsuitability for parole cannot be sustained. As the Court of Appeal below stated: "The Board makes no attempt to justify its decision with reference to the gravity of Dannenberg's crime as compared with other second degree murders, or the proportionality of the term he has served. Thus, the denial of a parole release date for Dannenberg was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it. [Citations.] (*Ramirez, supra,* 94 Cal.App.4th at p. 571.)"

Moreover, Dannenberg's present record is not only unblemished in terms of disciplinary infractions, but also showed many positive signs of contribution to the prison community in which he lived—including being a helpful resource to other prisoners and prison staff, fixing the electrical wiring in San Quentin Prison, and volunteering with an inmate education advisory committee and a Jewish religious group for prisoners. His advanced education in electrical engineering, advanced years (61 at the time the trial court considered his habeas corpus petition, 64 now), realistic parole plans, and consistently favorable psychological evaluations, all weigh in his favor.

In light of these facts, it is understandable that the Board sought some reason other than the commitment offense to justify the denial of a parole release date. It found this in the boilerplate declaration that Dannenberg needed more therapy "to face, discuss, understand and cope with stress in a nondestructive manner." As the trial court concluded, this finding is "entirely without foundation in the record. Indeed, all the evidence is to the contrary." This gaping hole in the Board's explanation of its decision does not, as the Court of Appeal below remarked, "inspire judicial confidence that the Board has given the parole application 'something more than mere pro forma consideration.' "

In sum, the Legislature has established a system for prisoners to obtain parole according to a uniform, proportional system designed by the Board. This court has recognized a parole applicant's constitutional right to due consideration. The Board has failed to comply with that statutory mandate, and perhaps the constitutional one as well. The majority places this court's imprimatur on that failure. Because of the nature of the parole process, there is more than a little risk that the Board's power to deny parole will at times be exercised in an arbitrary and capricious manner. Failure to grant parole where parole is due wastes human lives, not to mention considerable tax dollars, concerns that, along with public safety, unquestionably motivated the Legislature when it enacted section 3041. This court should not abdicate its responsibility to ensure that the Board lives up to its statutory and constitutional obligations.

I would therefore affirm the judgment of the Court of Appeal.

Kennard, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied February 23, 2005. Kennard, J., Werdegar, J., and Moerno, J., were of the opinion that the petition should be granted.