Filed 2/28/25  P. v. Ornelas CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH STEVE ORNELAS,<br><br>    Defendant and Appellant. | G063198<br><br>(Super. Ct. No. 18NF2556)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge. Affirmed and remanded with directions.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Joseph Steve Ornelas fired a handgun at three rival gang members in a La Habra park. A jury found Ornelas guilty of one count of murder, and two counts of attempted murder. The jury also found true three firearm enhancements. The trial court found Ornelas had two prior strikes and one prior serious felony conviction. The court imposed a determinate term of 10 years in prison, plus an indeterminate term of 94 years to life.

Ornelas claims the trial court: (A) erroneously instructed the jury on mutual combat; (B) abused its discretion by refusing to strike the firearm enhancements; and (C) lacked the authority to impose more than one five-year prior serious felony enhancement.

The parties agree there are errors in the abstract of judgment, and we concur. On remand, the trial court is directed to correct the abstract of judgment. In all other respects, the judgment is affirmed.

## I.

## FACTS AND PROCEDURAL BACKGROUND

On July 5, 2018, at about 2:30 p.m., Miguel A. (Miguel) drove a Nissan Altima car to a La Habra park. In the front passenger seat was Janelle G. (Janelle). In the rear passenger seat were two teenage boys, Miguel's son Michael A. (Michael), and Jason R. (Jason).

The park was located within the territory of the West Side La Habra criminal street gang. Miguel, Michael, and Jason were members of Monos, a rival gang. Prior to the group's arrival at the park, West Side La Habra gang member Ornelas was seen on a bicycle "patrolling the area."

Michael and Jason got out of the car while Miguel and Janelle stayed in the car. As the two teenage boys were drinking cans of beer in the park, Ornelas got off of his bicycle and quickly approached them on foot.

2

After words were exchanged, the boys started walking back to the car. Ornelas pulled a handgun out of his waistband, cocked it, and pointed it at the two boys. Michael and Jason ran back towards the car, calling out for Miguel, who jumped out of the car. Ornelas got within about 17 feet of the boys and started shooting his handgun at them about four or five times.

When the shooting stopped, Miguel was shot in his side, Michael was shot in the foot, and Jason had run away. Janelle drove Miguel and Michael to a location about a block away and called 911. Ornelas ran back to his bike and left the park.

*Police Investigation*

Police arrived at the Nissan Sentra car a few minutes after the shooting. Miguel was transported to the hospital where he died from a lone gunshot wound. Michael was also transported to the hospital. Police searched the car and found no weapons.

Police searched the park and found blood marks on the ground, two beer cans, and five spent cartridge cases. A later examination revealed the spent cartridges were all fired from the same gun. A bullet recovered from Miguel's body matched one of the cartridges found at the park. The police obtained surveillance videos and spoke to various witnesses; one of the witnesses identified Ornelas as the shooter from a photo lineup.

Two days after the shooting, Ornelas fled to Mexico. About nine months later, he was detained as he was attempting to reenter the United States through San Diego County. Police later extracted data from Ornelas' cell phone, which revealed he had been sending text messages about the shooting. For instance, Ornelas had asked someone, "'Just wanted to see if anyone was talking about what happened and if they know who did it.'"

3

*Trial Court Proceedings*

The People filed an amended information charging Ornelas with one count of murder (Miguel), and three counts of attempted murder (Michael, Jason, and Janelle). The information further alleged firearm enhancements, two prior strikes, and a prior serious felony conviction.

During a 10-day jury trial, the People called several witnesses, including Janelle and three percipient witnesses who were in the park during the shooting. One of the witnesses said that at some point during the encounter, one of the teenage boys reached for his rear waistband, but did not pull anything out. The People played the surveillance videos for the jury. The videos appear to show that Jason had a firearm in his rear waistband.

During the defense portion of the case, Ornelas called a police officer to the stand who had interviewed one of the percipient witnesses at the park. That witness initially told the officer that the older male who got out of the car (Miguel), was armed and shot about two rounds at the initial aggressor (Ornelas).

Ornelas testified that on the day of the shooting, he had received a text message from an unknown person wanting to purchase heroin. Ornelas said he agreed to meet that person at the La Habra park, and he rode his bike there. Ornelas said that when he saw the two young men in the park (Michael and Jason), he thought they were his customers.

Ornelas testified that as he walked towards the two young men, they were motioning for him to come towards them. Ornelas testified that Jason then handed his beer to Michael, reached for a gun in his waistband, and pulled it out. Ornelas said he feared being shot, but he "continued to walk towards them cautiously." Ornelas said as he walked towards the teenagers, they yelled for Miguel, whom he recognized from prison. Ornelas

4

said he saw Miguel as he got out of the car and "he was reaching towards his back waist. I proceeded to think he had a firearm as well."

Ornelas testified he heard Miguel yelling at Jason and Michael to fire at him. Ornelas said he was in fear that the boys and Miguel were going to start shooting at him and, "I continued to walk towards them . . . as . . . I started shooting."

The jury found Ornelas guilty of murder (Miguel) and two counts of attempted murder (Michael and Jason). The jury found true the associated firearm enhancements. The jury found Ornelas not guilty of one of the attempted murder counts (Janelle). The trial court found true Ornelas' prior convictions. The court dismissed one of the prior strike convictions and imposed a determinative term of 10 years in prison, plus an indeterminate term of 94 years to life.

## II.

## DISCUSSION

Ornelas claims the trial court: (A) erroneously instructed the jury on mutual combat; (B) abused its discretion by not striking the firearm enhancements; and (C) did not have the authority to impose more than one five-year prior serious felony enhancement. We shall analyze each claim.

### A. Mutual Combat Jury Instruction

Ornelas claims the trial court erroneously instructed the jury using CALCRIM No. 3471 ("Right to Self-Defense: Mutual Combat or Initial Aggressor") because substantial evidence did not support the mutual combat portion of the pattern jury instruction. We disagree, but even if we were to find error, we would not find the error to be prejudicial.

"'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.'" (*People v. Sigala* (2011) 191 Cal.App.4th 695, 698.) Generally, the prejudicial effect of an erroneous instruction is measured under the state law test. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 ["reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred"]; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

In this part of the discussion, we shall: (1) review relevant principles of law regarding mutual combat; (2) summarize the trial court proceedings; and (3) analyze the law as applied to the facts.

### 1. Relevant Legal Principles

A trial court has a duty "to instruct the jury on all general legal principles raised by the evidence and necessary for the jury's understanding of the case." (*People v. Mouton* (1993) 15 Cal.App.4th 1313, 1319.) The jury instructions are considered as a whole, and there is generally no prejudicial error unless there is a "reasonable likelihood" that the jurors misunderstood the instructions. (*People v. Clair* (1992) 2 Cal.4th 629, 662–663.)

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton*, *supra*, 4 Cal.4th at pp. 1129, 1131 ["unsupported theories should not be presented to the jury"].)

In determining whether a trial court's ruling is supported by substantial evidence, an appellate court does not confine its review to isolated pieces of evidence; rather, the reviewing court considers the whole record in a

light *most favorable to the ruling*, resolving all evidentiary conflicts and drawing all reasonable inferences *in support of the trial court's decision*. (*People v. Johnson* (1980) 26 Cal.3d 557, 577–578.)

Self-defense applies when a person has a reasonable belief that killing another person is necessary to avert an imminent threat of death or great bodily harm. (Pen. Code, § 197.)[1] It is a complete justification, meaning that a killing in reasonable self-defense is not a crime. However, self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

Further, in order to invoke the doctrine of self-defense, a defendant who was the initial assailant, or a defendant who agreed to engage in mutual combat, must have in good faith tried to withdraw from the combat, declined to fight further, and notified the other party of the withdrawal. (§ 197 (3) [if the defendant "was the assailant or engaged in mutual combat, [he or she] must really and in good faith have endeavored to decline any further struggle before the homicide was committed"].)

Generally, "as used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 (*Ross*).) To support an instruction on mutual combat, "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to*

---

[1] Further undesignated statutory references are to the Penal Code; we shall also omit the word "subdivision" or its abbreviation.

7

*fight before the claimed occasion for self-defense arose.*" (*Id.* at p. 1047.) "In other words, it is not merely the *combat,* but the *preexisting intention to engage in it,* that must be mutual." (*Id.* at p. 1045.)

### 2. Trial Court Proceedings

The unmodified CALCRIM No. 3471 jury instruction ("Right to Self-Defense: Mutual Combat or Initial Aggressor") reads as follows:

"A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:

"1. (He/She) actually and in good faith tried to stop fighting;

"[AND]

"2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)

"<*Give element 3 in cases of mutual combat.*>

"[AND

"3. (He/She) gave (his/her) opponent a chance to stop fighting.]

"If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

"[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend(himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

"[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied

8

and must occur before the claim to self-defense arose.]" (CALCRIM No. 3471.)

In this case, after the close of evidence, and during a discussion regarding the self-defense jury instructions, the trial court asked the parties if they "think 3471 applies - - mutual combat or initial aggressor?" The prosecutor said, "I believe the evidence is enough to show that the defendant was the initial aggressor." The prosecutor argued that "the testimony from multiple witnesses was that the boys were walking away, including from the defendant himself that they were walking away. That he ran across a park 300 feet or walked fastly [*sic*]."

The trial court said, "The real question I had is, you know, did they engage in mutual combat? I mean, was it mutual combat or did they start a fight? [¶] [The instruction] explains to the [jurors] that if they were to find it was mutual combat, how they analyze that." The court asked, "What is your thought, [defense counsel]?" Counsel responded, "I don't think it's supported by the evidence, and I would object to the Court giving mutual combat." After some further discussion, the court said, "I think there is sufficient evidence that there was some sort of conflict between them. [¶] The Court will instruct on 3471."

The trial court instructed the jury using a slightly modified version of the pattern CALCRIM No. 3471 jury instruction. The court included the bracketed portions of the instruction regarding mutual combat.

The trial court also instructed the jury: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200 ["Duties of Judge and Jury"].)

### 3. Application and Analysis

The portion of the CALCRIM No. 3471 instruction regarding Ornelas acting as the initial aggressor was plainly supported by substantial evidence. Multiple witnesses (including Ornelas) testified that he charged toward the two teenage boys just prior to the shooting. However, the evidence supporting the mutual combat portion of the instruction is a closer call.

Here, there was no evidence of an *explicit* agreement between Ornelas and the three rival gang members that they intended to engage in a mutual combat (either a physical fight or a gunfight) prior to the shooting. However, the evidence appears to have shown that Miguel, Michael, and Jason may have knowingly entered their rival gang's territory, and at least Jason was armed. And, according to Ornelas' testimony, Miguel was also armed, and he directed the two teenagers to shoot at Ornelas. Given the circumstantial evidence, the jurors may have reasonably inferred that all of the involved parties *impliedly* intended, consented, and/or agreed to engage in a mutual combat prior to the shooting. (See CALCRIM No. 3471 [the mutual "agreement may be expressly stated or implied"]; see also *Ross, supra,* 155 Cal.App.4th at p. 1045 ["'mutual combat' means . . . *mutual intention, consent, or agreement preceding the initiation of hostilities*"].)

In short, although this is admittedly a close call, we find that the bracketed portion of CALCRIM No. 3471 regarding mutual combat was supported by substantial evidence. (See *People v. Marshall, supra,* 15 Cal.4th at p. 39 ["that is, evidence sufficient to deserve jury consideration"]; *People v. Johnson, supra,* 26 Cal.3d at pp. 577–578 [a reviewing court considers the whole record in a light most favorable to the trial court's ruling].)

Thus, we find the trial court did not commit an error by instructing the jurors on mutual combat. But in any event, even if we were to

10

find instructional error, we would not find the error to be prejudicial.

"[G]iving an irrelevant or inapplicable instruction is generally "'only a technical error which does not constitute ground for reversal.'"'" (*People v. Cross* (2008) 45 Cal.4th 58, 67.) "'It is error to give an instruction which correctly states a principle of law which has no application to the facts of the case.' [Citation.] Yet such an error is usually harmless, having little or no effect 'other than add to the bulk of the [instructions].'" (*People v. Rollo* (1977) 20 Cal.3d 109, 122–123, superseded by statute on other point as recognized in *People v. Castro* (1985) 38 Cal.3d 301, 308.)

Here, we presume the jury followed the entirety of the jury instructions. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30.) Accordingly, if the jury found no facts supporting a theory that Ornelas and his rivals had an express or implied arrangement to engage in a mutual combat prior to the shooting, we presume the jury would have simply disregarded that portion of the instruction. (See CALCRIM No. 200 ["Some of these instructions may not apply, depending on your findings about the facts of the case"].)

Ornelas argues that *Ross, supra,* 155 Cal.App.4th 1033, compels a different result. We disagree.

In *Ross*, defendant got into an argument with Maria S. who eventually "slapped him. Defendant responded with a blow that fractured her cheekbone." (*Ross, supra,* 155 Cal.App.4th at p. 1036.) The trial court gave an instruction to "the jury on the doctrine of 'mutual combat' as it affects a plea of self-defense." (*Id.* at p. 1041.) At that time, the pattern instruction did not define the phrase mutual combat. (*Id.* at p. 1042, fn. 9.) While deliberating, the jury asked the court to define mutual combat, but the court did not do so and instead instructed the jurors to rely on "your common, everyday meaning of those words or that phrase." (*Id.* at pp. 1042–1043.) The jury found

11

defendant guilty of aggravated assault and related charges. (*Id*. at p. 1041.)

The Court of Appeal held that "the phrase 'mutual combat' is not only ambiguous but a misnomer. The . . . doctrine inheres not in the combat but in the *preexisting intent to engage in it*." (*Ross*, *supra*, 155 Cal.App.4th at p. 1045.) The court found it likely the jurors misunderstood the doctrine and reversed the judgment: "A properly instructed jury would not find 'mutual combat' on the present facts, and would therefore presumably ignore the instruction. But the jury here was *not* properly instructed. It was left to suppose that the instruction might apply to *any* exchange of blows. Moreover the record affirmatively shows that jurors did not ignore the instruction. They petitioned the [trial] court in vain to clarify it." (*Id*. at pp. 1056, 1057.)

Unlike *Ross*, in this case the trial court accurately instructed the jury on the distinctive legal meaning of the phrase mutual combat: "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (CALCRIM No. 3471, italics added.) Thus, if the jury determined that there was no evidence to support the mutual combat doctrine, we find it likely that the jurors simply ignored that portion of the instruction. (Compare *Ross*, *supra*, 155 Cal.App.4th at p. 1056.)

To reiterate and conclude, even if we were to find instructional error, we would not find it reasonably probable that Ornelas was prejudiced by the error. (See *People v. Guiton*, *supra*, 4 Cal.4th at p. 1130 ["reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred"].)

## B. Firearm Enhancements

Ornelas claims the trial court abused its discretion by refusing to

12

strike the firearm enhancements. We disagree because the court explicitly found that the dismissal of the firearm enhancements would not be in the interests of justice and would endanger public safety.

Ordinarily, a trial court does not abuse its sentencing "discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In this discussion, we shall: (1) review relevant principles of law regarding sentencing enhancements; (2) summarize the trial court proceedings; and (3) analyze the law as applied to the facts.

### 1. Relevant Legal Principles

"The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." (§ 1385 (a).) In addition to dismissing an entire "action," the authority of a judge or a magistrate to dismiss under section 1385 also applies to sentencing enhancements.[2] (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490–491.)

Under an amendment to section 1385 that became effective January 1, 2022, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385 (c)(1), as amended by Stats. 2021, ch. 721, § 1.)

"In exercising its discretion under this subdivision, the court

---

[2] Section 1385 does not permit a defendant to make "a motion" to dismiss a sentencing enhancement, but a defendant generally has the right to *invite the court* to dismiss enhancements in the furtherance of justice. (See *People v. Carmony, supra,* 33 Cal.4th at p. 375.)

13

shall consider and afford great weight to evidence offered by the defendant to prove that any of the [enumerated] mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."[3] (§ 1385 (c)(2).)

The California Supreme Court has recently interpreted section 1385. (*People v. Walker* (2024) 16 Cal.5th 1024.) Based on the statute's plain language, the Court found it "clear that the structure [of section 1385 (c)(2)] does not 'presume' [citation] an enhancement should be dismissed whenever an enumerated mitigating circumstance is present, but instead 'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement' [citation] and this 'furtherance of justice' [citation] inquiry requires a trial court's ongoing exercise of 'discretion' [citation]. Thus, notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.'" (*Id.* at p. 1033.)

"We emphasize, however, that, in most cases, 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors . . . ." (*People v. Walker, supra,* 16 Cal.5th at p. 1033.)

---

[3] There are nine mitigating circumstances enumerated in section 1385 (c)(2).

### 2. Trial Court Proceedings

As to the counts involving Miguel and Michael, the jury found it true that Ornelas personally used a firearm causing death or great bodily injury. (§ 12022.53 (d).) And as to the count involving Jason, the jury found it true that Ornelas personally used a firearm. (§ 12022.53 (c).)

Prior to sentencing, Ornelas filed a motion arguing section 1385 mandated dismissal of the firearm enhancements due to two mitigating circumstances: (1) "[m]ultiple enhancements are alleged in a single case'" (§ 1385 (c)(2)(B)); and (2) "'[t]he application of an enhancement could result in a sentence of over 20 years [(§1385 (c)(2)(C)].'" (Boldfacing omitted.)

The People filed a response conceding that the two mitigating circumstances were present, but the People argued that the trial court should nevertheless impose the firearm enhancements: "Although certain provisions in [section 1385] subdivision (c) limit the exercise of the court's discretion in refusing to strike an enhancement, the court retains the overarching discretion to determine whether striking of an enhancement will be contrary to the furtherance of justice."

At the start of the sentencing hearing, the trial court spoke to Ornelas: "The Court now has a much broader discretion than it has ever had in terms of imposing sentences for criminal offenses . . . , and I will be making a variety of different findings in terms of sentencing you."

After dealing with other aspects of Ornelas' sentence (e.g., denying probation, striking one of the prior strike convictions, etc.), the trial court ruled on Ornelas' invitation to strike the firearm enhancements:

"I now have discretion to strike the 12022.53 enhancements, that is, the jury's finding that you personally discharged a firearm causing death as it relates to Count 1, causing injury as it relates to Count 2, and a

15

discharge as it relates to the third victim."

"In looking at all of the factors that are now in the [legislation], including factors in which the legislature tells me I should consider strongly for purposes of deciding whether or not I exercise that enhancement, looking at all of, again, the facts of this particular case, the facts of your use of the firearm, your criminal background, I do not believe it is in the interest of justice to strike any of those three firearm use enhancements . . . .

"And I have done so after looking at all of the mitigating factors in 1385(c) to determine if any of them are present, and I don't believe that there are any mitigating factors relating to the crime that you committed.

"The victim was not the initiator in this case. You were [the] provoker of the incident. [¶] I know that you set forth a defense of self-defense. The jury rejected it. And I believe the facts of the case are that that was the proper and right finding by the jurors in this case.

"You were not justified in any way in committing any of these offenses. [¶] You intended to kill, and you did, in fact, use a gun and attempted to kill three separate individuals being successful as it related to one of those victims. [¶] You did so in a public setting that could have resulted in harm to innocent bystanders. [¶] This crime did involve great violence. [¶] And the Court believes that dismissal of any of those offenses would not only be in the interest of justice, but would endanger public safety. [¶] So the Court is not going to exercise its discretion to strike any of those [firearm] use enhancements."

### 3. Application and Analysis

The trial court was plainly conversant with the relevant legal principles, as demonstrated by its recitation of the mitigating factors under

16

section 1385. The court was also familiar with the pertinent facts, given that it had presided over the trial. We find the court then made a reasoned decision to deny Ornelas' invitation to strike the firearm enhancements, primarily based on its determination that it would not "be in the interests of justice" and "would endanger public safety."

In short, we find that the trial court did not approach its decision in an arbitrary or capricious manner. While we recognize that other courts may have ruled differently, we do not find that the court in this case abused its discretion. (See *People v. Shaw* (2020) 56 Cal.App.5th 582, 588 [no abuse of discretion where the trial "court considered the relevant factors and reasonably concluded it would not be 'in furtherance of justice' to strike the . . . enhancement"].) Thus, we affirm the trial court's ruling, which denied Ornelas' invitation to strike the three firearm enhancements.

Ornelas argues: "Two of the mitigating factors contained in the newly amended Penal Code section 1385 apply to appellant, both of which *require* the trial court to dismiss the enhancement." We disagree.

Courts have consistently held that the striking of enhancements remains discretionary, despite the recent amendments to section 1385. (See *Walker*, *supra*, 16 Cal.5th at p. 1033 [despite "the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry'"]; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 291 ["We conclude that section 1385(c)(2)(C) does not mandate dismissal of an enhancement when the court finds that dismissal would endanger public safety"]; *People v. Anderson* (2023) 88 Cal.App.5th 233, 239 ["the trial court has discretion to dismiss sentencing enhancements; certain circumstances weigh greatly in favor of dismissal; and a finding of danger to public safety can overcome the

17

circumstances in favor of dismissal"].)

To reiterate and conclude, we find that the trial court did not abuse its discretion when it declined Ornelas' invitation to dismiss the firearm sentencing enhancements.

*C. Five-Year Prior Serious Felony Enhancements*

Ornelas claims the trial court lacked the authority to impose more than one five-year prior serious felony enhancement. We disagree because multiple five-year prior serious felony enhancements can be imposed when the underlying convictions involve indeterminate terms.

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

In this discussion, we shall: (1) review relevant principles of law regarding five-year prior serious felony enhancements; (2) summarize the trial court proceedings; and (3) analyze the law as applied to the facts.

*1. Relevant Legal Principles*

"A person convicted of a serious felony who previously has been convicted of a serious felony in this state or . . . in another jurisdiction . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667 (a)(1).)

"A determinate sentence is one 'consisting of a specific number of

18

months or years in prison.'" (*People v. Smithson* (2000) 79 Cal.App.4th 480, 503.) Under the determinate sentencing scheme (§ 1170 et seq.), trial courts are usually given a choice among three determinate terms (lower, middle, or upper) for most crimes. (See, e.g., § 215 (b) ["Carjacking is punishable by imprisonment in the state prison for a term of three, five, or nine years"].)

"An indeterminate sentence means 'the defendant is sentenced to life imprisonment.'" (*People v. Smithson*, *supra*, 79 Cal.App.4th at p. 503.) "Some indeterminate sentences carry minimum terms . . . which establish a minimum time that must be served under an indeterminate sentence before a convict can be eligible for parole." (*Ibid*.) An indeterminant term applies to "a much narrower category of *serious crimes and offenders*." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1097, italics added; see, e.g., § 190 (a) ["every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 15 years to life"]; see also, e.g., 206.1 ["Torture is punishable by imprisonment in the state prison for a term of life"].)

Under our state's determinate sentencing laws (§ 1170 et seq.) enhancements for prior convictions are added just once as the final step in computing the total defendant's sentence. (§ 1170.1 (a).) "[W]hen any person is convicted of two or more felonies . . . and a consecutive term of imprisonment is imposed . . . , the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, *and any additional term* imposed for applicable enhancements for prior convictions." (§ 1170.1 (a), italics added.)

A prior conviction is considered a status-based enhancement that applies to the defendant, rather than an offense-based enhancement (such as a great bodily injury or firearm enhancement) that applies to an individual count. (*People v. Tassell* (1984) 36 Cal.3d 77, 90 [unlike offense-based

19

enhancements, status-based enhancements "have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence"].)

However, section 1170.1, which limits the imposition of a defendant's status-based enhancement to only one time under our state's *determinate* sentencing scheme, does <u>not</u> apply when a defendant's status or the defendant's convicted offenses involve *indeterminate* (life imprisonment) sentences. (See *People v. Williams* (2004) 34 Cal.4th 397, 402 (*Williams*).)

In *Williams*, a jury convicted defendant of three sex crimes, which were all serious felonies. (*Williams, supra*, 34 Cal.4th at p. 400.) The defendant also had prior convictions for two serious felonies that were brought and tried separately. (*Ibid*.) The trial court imposed a concurrent life sentence (25 years to life) for the defendant's three convictions, plus five years for each of defendant's two prior serious felony convictions (10 years), resulting in an aggregate sentence of 35 years to life. (*Id*. at pp. 400–401.) On appeal, defendant argued "that section 1170.1 permitted the [five-year prior serious felony] enhancements to be imposed only once." (*Id*. at p. 401.) The Supreme Court disagreed: "Section 1170.1, however, applies only to *determinate* sentences. It does not apply to multiple indeterminate sentences imposed under the Three Strikes law." (*Id*. at p. 402.)

Since the Supreme Court's holding in *Williams*, which allows a trial court to impose multiple five-year prior serious felony enhancements to indeterminate Three Strike sentences, other lower courts have further held that the holding applies to *any* indeterminate sentence; not just an indeterminate sentence imposed under Three Strikes. (See, e.g., *People v. Tua* (2018) 18 Cal.App.5th 1136, 1141 ["Prior serious felony enhancements are added *once to each count on which an indeterminate sentence is imposed*"],

20

italics added; see also *People v. Misa* (2006) 140 Cal.App.4th 837, 844–847 [a five-year prior serious felony enhancement was properly imposed both on a torture count (with an indeterminate life sentence), and also on an aggravated assault count (with a determinate sentence)].)

### 2. *Trial Court Proceedings*

The jury found Ornelas guilty of second degree murder, which required an indeterminate term of 15 years to life. (§§ 187, 190 (a).) The jury also found Ornelas guilty of two counts of first degree murder, which required an indeterminate term of seven years to life for each count. (§§ 187, 664, 3046 (a)(1).) The jury further found true the firearm enhancements. (§ 12022.53, (c), (d).) The trial court found true two prior serious and violent felony (strike) convictions. (§ 667 (d), (e)(2)(A).) The court also found true a prior serious felony conviction. (§ 667 (a)(1).)

Prior to a hearing, both sides filed sentencing briefs. Citing *Williams*, *supra*, 34 Cal.4th 397, the People argued that the five-year prior serious felony enhancement could be applied to all three of Ornelas' convictions (one murder, two attempted murders), noting that "the rule of adding priors only once to the total term does not apply to these indeterminate sentences [citation]." (Boldface omitted.)

In his brief, Ornelas urged the trial court to strike his two prior strike convictions, strike the three firearm enhancements, and strike his one prior serious felony conviction. Ornelas did not dispute the People's cited authority that the court had the discretion to impose the five-year prior serious felony enhancement as to each of his three convictions.

At sentencing, the trial court struck one of Ornelas' two prior strikes, declined to strike the firearm enhancements, and declined to strike

21

his prior serious felony conviction. The court said it would sentence Ornelas consecutively as to counts one and two, and concurrently as to count three.

The trial court imposed 30 years to life for the murder (15 years to life doubled), plus 25 years to life for the firearm enhancement, plus five years for the serious felony prior conviction. The total sentence for count one (Miguel) was 55 years to life, plus five years.

The court imposed 14 years to life for the attempted murder conviction in count two (seven years to life doubled), plus 25 years to life for the firearm enhancement, plus five years for the serious felony prior conviction. The total (consecutive) sentence for count two (Michael) was 39 years to life, plus five years.

The court imposed 14 years to life for the attempted murder conviction in count three (seven years to life doubled), plus 20 years for the firearm enhancement, plus five years for the serious felony prior conviction. The total (concurrent) sentence for count three (Jason) was 14 years to life, plus 25 years.

The trial court concluded by addressing Ornelas directly: "Accordingly, you are sentenced to an aggregate term of life in prison with a minimum of 94 years, plus an additional 10 years determinant term." [4]

---

[4] The abstract of judgment does not accurately reflect the trial court's oral pronouncement of Ornelas' sentence as to the indeterminate term (see section 6a), and it does not accurately reflect the *consecutive* determinate term (see section 12). Further, there is no Judicial Council form summarizing the determinate portion of Ornelas' sentence. And as the parties agree, the court's calculation of presentence credits is also inaccurate. On remand, the trial court is instructed to correct the clerical errors in the abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["appellate courts [may order the] correction of abstracts of judgment"].)

### 3. Application and Analysis

There is no dispute that the trial court was statutorily authorized to impose indeterminate (life) sentences for each of Ornelas' three convictions: 55 years to life for Miguel's murder; 39 years to life for Michael's attempted murder; and 14 years to life for Jason's attempted murder. (See *In re Dannenberg, supra,* 34 Cal.4th at p. 1097 [an indeterminant term applies to "a much narrower category of serious crimes and offenders"].)

We also find that the court was statutorily authorized to impose the five-year prior serious felony enhancement as to each of his three convictions because each of Ornelas' convictions involved the imposition of *indeterminate* sentences. (See *Williams*, *supra*, 34 Cal.4th at p. 400.) Indeed, in *Williams*, the Supreme Court explicitly held that the statutory restriction under section 1170.1, which allows only one five-year prior serious felony enhancement to be imposed under our state's *determinate* sentencing scheme, "applies only to *determinate* sentences." (*Id.* at p. 402.)

Thus, consistent with the relevant statutes and case law, we hold that the trial court did not abuse its sentencing discretion by imposing more than one five-year prior serious felony enhancement. (See *Haraguchi v. Superior Court, supra,* 43 Cal.4th at pp. 711–712, fns. omitted [under the abuse of discretion standard, "conclusions of law are reviewed de novo"].)

Ornelas argues the Supreme Court's holding in *People v. Sasser* (2015) 61 Cal.4th 1 (*Sasser*), compels a different result. We disagree.

In *Sasser,* a jury convicted defendant of multiple sex offenses against multiple victims. (*Sasser, supra,* 61 Cal.4th at p. 7.) Defendant had one prior serious felony conviction and one prior strike conviction. (*Id.* at p. 6.) At sentencing, the trial court doubled defendant's *determinate* sentences (under the "Three Strikes" law), and imposed a five-year prior serious felony

enhancement as to each of defendant's *determinate* terms. (*Id.* at p. 7.) The Supreme Court reversed, holding that under section 1170.1, the five-year prior serious felony enhancement may be imposed only once as to multiple second-strike *determinate* terms. (*Sasser*, at pp. 6–8.) The Court concluded that the one-time-only determinate sentencing restriction under section 1170.1 applied to defendant's case, even though defendant's determinate sentences were doubled under the Three Strikes law. (*Sasser*, at p. 7.)

The Supreme Court reasoned that the basis for deciding whether section 1170.1 applies is *not* whether the defendant is being sentenced under the Three Strikes law or the "One Strike" law. (*Sasser, supra*, 61 Cal.4th at p. 13.) Rather, the Court held that the fundamental question is whether the defendant is being sentenced to a determinate or an indeterminate term: "Because the *determinate* portion of Sasser's sentence was subject to section 1170.1, the prior serious felony enhancement should have been applied only once to that portion of his overall sentence." (*Id.* at p. 17, italics added.)

Here, unlike *Sasser*, each of Ornelas' three convictions involved an indeterminate sentence (life imprisonment), rather than a determinate sentence (a specific number of years). The underlying sentencing considerations in *Sasser* are distinguishable from those in this case. Thus, the *Sasser* holding does not alter our analysis.

To reiterate and conclude, we hold that a trial court has the legal authority under section 667 (a) to impose more than one five-year prior serious felony enhancement when the defendant has one prior serious felony conviction, and the instant convictions involve indeterminate sentences.

24

III.

DISPOSITION

On remand, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The amended abstract of judgment should accurately reflect Ornelas' pronounced sentence and presentence credits.

In all other respects, the judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


SCOTT, J.